IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| ALTICOR GLOBAL HOLDINGS INC., | : | |
| | : | |
| Plaintiff, | : | Case No.: |
| | : | |
| v. | : | Hon. |
| | : | |
| AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY (n/k/a Chartis Specialty Insurance Company) and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, | : | **COMPLAINT AND JURY DEMAND** |
| | : | |
| Defendants. | : | |

| | |
|---|---|
| WILSONYOUNG PLC<br><br>Attorneys for Plaintiff<br>ALTICOR GLOBAL HOLDINGS INC.<br>James D. Wilson (P41338)<br>Two Towne Square<br>Suite 901<br>Southfield, MI 48076<br>(313) 962-0800<br>jwilson@wilsonyoungplc.com | |

## COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, Alticor Global Holdings Inc. ("AGHI"), by and through its undersigned attorneys, and for its Complaint against Defendants, American International Specialty Lines Insurance Company (n/k/a Chartis Specialty Insurance Company) ("AISLIC"), and National Union Fire Insurance Company of Pittsburgh, PA ("National Union") (collectively "Insurers"), states as follows:

## NATURE OF ACTION

1.     This is an action for the purpose of determining an actual controversy between the parties, construing rights and legal obligations arising from insurance policies, the Insurers' breach of those insurance policies, the damages due AGHI as a result of the Insurers' breach of the insurance policies, violation of Michigan Compiled Law 500.2006, and common law breach of the implied covenant of good faith and fair dealing.

## PARTIES

2.     AGHI is a Michigan corporation, with its principal place of business located at 7575 Fulton Street East, Ada, MI 49355.

3.     AISLIC was an Alaska corporation with its principal place of business in New York, New York when it issued the subject insurance policy to AGHI; however, AISLIC re-domesticated to Illinois in 2007, and

2

is now known as Chartis Specialty Insurance Company, an Illinois corporation, with its principal place of business in New York, New York.

4.     National Union is a Pennsylvania corporation with its principal place of business in New York, New York.

## JURISDICTION AND VENUE

5.     This is an action between citizens of different states: Plaintiff AGHI, at all times relevant, was and is a citizen of the State of Michigan. Defendant AISLIC, at all times relevant, was a citizen of Alaska and is now, as Chartis Specialty Insurance Company, a citizen of Illinois.   Defendant National Union, at all times relevant, was and is a citizen of Pennsylvania.

6.     Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332 because Plaintiff AGHI is a citizen of a different state from Defendant Insurers, and because the value of the matter in controversy exceeds $75,000, exclusive of interest and costs.

7.     Venue in this District is proper pursuant to 28 U.S.C. § 1391 because:   (1) AGHI's principal place of business is in this District; (2) AISLIC did, and both Chartis Specialty Insurance Company and National Union do, business in this District; (3) a substantial portion, if not all, of the events, acts and/or omissions on which this matter is based

occurred in the Western District of Michigan; and (4) the insurance policies in question were issued to AGHI in the Western District of Michigan.

## GENERAL ALLEGATIONS

### Underlying Claim and Litigation

8.     From various jurisdictions throughout the world, including the United States, indirect subsidiaries of AGHI operate one of the largest direct selling ventures in the world – Amway.  The products and services offered through this venture are marketed and sold by independent distributors, known as Amway Independent Business Owners ("IBOs"), in more than 80 countries and territories worldwide.

9.     The claim at issue arises out of allegations of copyright infringement levied against AGHI subsidiaries by the three largest sound recording companies in the world (collectively the "Record Companies").[1] More specifically, the Record Companies alleged that various subsidiaries of AGHI—namely, Alticor Inc., Amway Corp., Amway International Inc., and a number of their global affiliates (collectively the "Amway Interests")—were directly, contributorily, and vicariously liable for the alleged infringement of

---

[1] Together with their subsidiaries, the Record Companies include UMG Recordings, Inc., Capitol Records, LLC, Sony Music Entertainment, Warner Music Group Corp., Sony Music Entertainment US Latin LLC, Arista Music, Arista Records LLC, Provident Label Group LLC, Zomba Recording LLC, Atlantic Recording Corporation, Elektra Entertainment Group Inc., Warner Bros. Records Inc., and Warner Music Latina Inc.

copyrights to sound recordings contained in videos allegedly posted, from various locations throughout the world, on the Internet by the Amway Interests, IBOs, or third parties purportedly associated therewith (the "Claim"). The videos at issue were primarily posted on public websites like YouTube, Facebook, and Vimeo, but also on private websites owned, operated, and maintained by the Amway Interests, IBOs, or purportedly associated third parties.

10.  The Claim was first made by the Record Companies by letter dated November 27, 2012, wherein it was alleged that the Amway Interests were both directly and indirectly liable for the infringement of 220 different sound recordings contained in 335 videos uploaded to the Internet. Ultimately, the Record Companies asserted that the Amway Interests were directly, contributorily, and vicariously liable for infringement of over 650 copyrighted sound recordings contained in more than 1,200 videos uploaded to the Internet from locations around the world (the "Accused Videos").

11.  In support of these contentions of liability, the Record Companies alleged that:

   a. the creation and uploading of the Accused Videos, which began in 2006, was the result of the Amway Interests' plan

5

or scheme to use the allegedly infringed sound recordings to market and enhance their businesses through commercial promotions and advertisements on Internet websites belonging to or controlled by the Amway Interests, as well as on Internet sites belonging to others;

b. as part of this plan or scheme, the Amway Interests encouraged IBOs to use the Internet, including social media, for marketing of the products and services offered by the Amway Interests; and

c. the Amway Interests benefitted from uploading of the Accused Videos to websites on the Internet through, including, but not limited to: (i) recruitment of new Amway distributors, (ii) increasing the sale of Amway products, (iii) expanding global recognition of the Amway brand, and (iv) commercial advertisement of the "Amway line of products."

12.   The Record Companies sought substantial damages for the Claim against the Amway Interests arising from the alleged copyright infringements of sound recordings contained in the Accused Videos and posted on the Internet.

13.   The Record Companies and the Amway Interests attempted to resolve the Claim informally, including through mediation, but those efforts were not successful.

14.   On April 4, 2014, in an effort to manage and limit the Claim, Alticor Inc. and Amway Corp. filed a complaint against the Record Companies in the United States District Court for the Middle District of Florida, Orlando Division, which was assigned Case No. 14-cv-542, alleging, among other things, breach of contract and seeking a declaratory judgment that:   (a) there was no direct copyright infringement by the Amway Interests, (b) the Amway Interests were not vicariously liable for alleged copyright infringements by others, (c) the Amway Interests were not contributorily liable for the alleged copyright infringements by others, (d) an implied license had been granted by the Record Companies for many, if not all, of the Accused Videos, (e) many of the Accused Videos constituted fair use and were thus not actionable, (f) there can be no extraterritorial application of the United States' copyright laws to videos uploaded to the Internet outside of the United States, (g) the Record Companies were unlawfully misusing their copyrights, and (h) the Record Companies' claims were barred under the doctrines of laches, estoppel, and unclean hands ("Amway's Complaint").

15.    The Record Companies, in response, filed motions to dismiss all or portions of Amway's Complaint, and filed counter-claims against the Amway Interests asserting claims of direct, contributory, and vicarious copyright infringement in violation of federal law, state common law copyright infringement and misappropriation, unfair competition, conversion, and breach of contract ("Record Companies' Counter-Claim").

16.    The Record Companies also brought separate lawsuits against a number of IBOs in the United States District Court for the Middle District of Florida, Orlando Division as well as the United States District Court for the Central District of California, Los Angeles Division (the "IBO Defendants").  The California lawsuit was transferred to the Middle District of Florida, Orlando Division, where each of the suits (collectively referred to as the "Underlying Litigation") were consolidated for purposes of discovery.

17.    In the Spring of 2016, counsel for the Record Companies advised the Amway Interests that their related companies owned the separate copyrights in the compositions underlying the Record Companies' sound recordings (the "Music Publishers"), and any claims possessed by the Music Publishers against the Amway Interests for the infringement of those copyrights in the Accused Videos would have to be settled with the Music Publishers.

18.    Mediation was held between the Record Companies, certain Music Publishers, the Amway Interests, and the IBO Defendants in October 2016, and a settlement in principle was reached at that mediation, subject to the parties' ability to reach consensus on the terms and conditions for the appropriate settlement agreements and releases.

19.    In December 2016, the Record Companies, the Music Publishers, and the Amway Interests[2] entered into confidential settlement agreements and releases which disposed of the Litigation.

20.    On December 27, 2016, AGHI and the Amway Interests completed the terms of the settlement agreements resulting in, on January 4, 2017, full and final dismissal of the Underlying Litigation, with prejudice.

21.    Neither AGHI nor the Amway Interests paid any portion of the IBO Defendants' defense costs incurred in the Underlying Litigation, or any portion of any settlement monies paid in resolution of the claims and allegations brought by the Record Companies' and Music Publishers' against the IBO Defendants.

22.    The Amway Interests incurred attorneys' fees, costs and expenses in the Underlying Litigation defending against the Record

---

[2] The IBO Defendants entered into their own settlement agreements with the Record Companies and the Music Publishers, resolving the claims and allegations brought against them separately and independently from the Amway Interests.

Companies' and Music Publishers' claims, and paid all such defense costs without contribution from the Insurers.

23.    The total loss sustained by AGHI and the Amway Interests for the Claim, including defense costs and claim expenses, is well in excess of $5 million (the "Loss").

**Relevant Policies Issued by the Insurers**

    **a.  AISLIC's Internet & Network Security Policy**

24.    Defendant AISLIC issued a policy of insurance to AGHI entitled "AIG netAdvantage Security - Internet & Network Security Insurance" with effective dates from July 1, 2006 to July 1, 2007, extended by Endorsement to July 20, 2007, identified as Policy Number 672-91-00 ("Internet & Network Security Policy").  (**Exhibit A**.)

25.    AGHI paid AISLIC $750,078 in premium for the Internet & Network Security Policy.

26.    The Internet & Network Security Policy contains multiple coverage parts, including Coverage A., entitled "Internet Media Liability Coverage."   The Internet Media Liability Coverage part provides a $25,000,000 limit of liability per wrongful act or series of continuous, repeated, or related wrongful acts, subject to a retention of $500,000.

27.    The Internet Media Liability Coverage part has no retroactive date, and under this coverage part AISLIC agreed:

> **We** shall pay on **your** behalf those amounts, in excess of the applicable **Retention**, **you** are legally obligated to pay . . . as **damages**, resulting from any **claim(s)** made against you for **your wrongful act(s)** in the display of **Internet media**.  Such **wrongful act(s)** must occur during the **policy period**.  (**Exhibit A**, page 1.)[3]

28.    Pursuant to the Internet Media Liability Coverage part, AISLIC has both the right and duty to defend a suit brought against the Amway Interests for wrongful acts, even if the suit is groundless or fraudulent. (**Exhibit A**, page 1.)  As a corollary to this right and duty, AISLIC further agreed to pay all "**claim expenses**," including reasonable and necessary attorney fees, incurred by the Amway Interests in connection with such suit. (**Exhibit A**, page 2.)

29.    For purposes of the Internet Media Liability Coverage part, AISLIC defines the terms "**you**," "**your**," and "**insured**" to include AGHI and its subsidiaries, as well as "any agent or independent contractor, including distributors, licensee and sub-licensees, in their provision of materials for **Internet media** on behalf of or at the direction of [AGHI]".  (**Exhibit A**, pages10-11.)

---

[3] Words or phrases in **bold** are defined in the AISLIC and National Union policies.

30.    Among the other defined terms in the Internet Media Liability Coverage part, is the definition of "**wrongful act(s)**" which means:

(1) with respect to coverage A [Internet Media Liability Coverage], any actual or alleged breach of duty, neglect, act, error, misstatement, misleading statement, or omission that results in:

* * *

(b) an infringement of copyright, domain name, title, slogan, trademark, trade name, trade dress, mark or service name, or any form of improper deep-linking or framing; plagiarism or misappropriation of ideas under implied contract or other misappropriation of property rights, ideas or information; . . . .

(**Exhibit A**, page 10.)

31.    "**Internet media**" is defined to mean (1) **content** on **your Internet site**; or (2) **content** created by **you** that is displayed on an **Internet site**.  (**Exhibit A**, Endorsement #9.)

32.    Under the Internet Media Liability Coverage part, **content** means, "written, printed, video, electronic, digital, or digitized material, including **advertising**, images, music, descriptions, and information." (**Exhibit A**, Endorsement #9.)

33.    Other definitions applicable to Internet Media Liability Coverage are:  "**Advertising**," which is defined to mean "material on the **Internet** in any publicity or promotion, including branding, co-branding, sponsorships

or endorsements, on **your** own behalf or for others" (**Exhibit A**, page 2);
"**Damages**," which is defined as "the amount that **you** shall be legally
required to pay because of judgments or arbitration awards rendered
against **you**, or for settlements negotiated by **us** or **you** in accordance with
Clause II, . . ." (**Exhibit A**, page 4); "**Internet site**," which is defined as "a
collection of web pages that are organized and linked together and enable
a computer or computer technology user to retrieve material stored on one
or more servers" (**Exhibit A**, Endorsement #9); and "**your Internet site**,"
which is defined as "an **Internet site** designated by a domain name owned
or licensed by **you**" (**Exhibit A**, Endorsement #9).

   **b.  National Union's Commercial Umbrella Liability Policy**

   34.   Defendant National Union issued an "Umbrella Prime -
Commercial Umbrella Liability Policy" to AGHI for the policy period from
April 1, 2006 to April 1, 2007, which provides limits of liability for each
occurrence and in aggregate, of $50,000,000, with a retained limit of
$10,000, identified as Policy Number 4485305 (the "Commercial Umbrella
Liability Policy").  (**Exhibit B**.)

   35.   AGHI paid National Union $1,750,000 for the Commercial
Umbrella Liability Policy.

36.    The Commercial Umbrella Liability Policy is triggered upon exhaustion of a primary commercial general liability policy issued by ACE American Insurance Company ("ACE American"), through a payment by AGHI of $2,000,000 in settlement or to satisfy a judgment for a claim brought under the ACE American policy.

37.    AGHI and the Amway Interests exhausted the Ace American policy when they settled and resolved the Underlying Litigation, thereby triggering National Union's Commercial Umbrella Liability Policy.

38.    National Union's Commercial Umbrella Liability Policy states in its Insuring Agreement:

A.  We will pay on behalf of the **Insured**[4] those sums in excess of the **Retained Limit** that the **Insured** becomes legally obligated to pay as damages by reason of liability imposed by law because of **Bodily Injury**, **Property Damage** or **Personal Injury and Advertising Injury** to which this insurance applies or because of **Bodily Injury** or **Property Damage** to which this insurance applies assumed by the **Insured** under an **Insured contract**.  (**Exhibit B**, page 1 of 23.)

39.    The Commercial Umbrella Liability Policy also states:

B. This policy applies, only if:

\* \* \*

---

4 As "subsidiar[ies], associated or affiliated companies" of AGHI, the Amway Interest are also Insureds within the meaning of the ACE American and Commercial Umbrella Liability Policies.

2.  the **Personal Injury and Advertising Injury** is caused by an **Occurrence** that takes place anywhere arising out of your business, but only if the **Occurrence** was committed during the **Policy Period**.  (**Exhibit B**, page 1 of 23.)

40.    The Commercial Umbrella Liability Policy provides that National Union will have both "the right and the duty to defend any **Suit** against [AGHI or the Amway Interests] that seeks damages for . . . **Personal Injury and Advertising Injury** covered by this policy, even if the **Suit** is groundless, false or fraudulent when:  the total applicable limits of [the ACE American policy and any other applicable insurance] have been exhausted by payment of **Loss** to which this policy applies; . . ."  (**Exhibit B**, page 2-3 of 23.)

41.    The Commercial Umbrella Liability Policy applies only to **Personal Injury and Advertising Injury** alleged to have arisen out of the infringement of copyright in an **Advertisement**.  (**Exhibit B**, page 7 of 23.)

42.    The  Commercial  Umbrella  Liability  Policy  defines "**Advertisement**" to mean "a notice that is broadcast or published to the general public or specific market segments about **your** goods, products or services for the purpose of attracting customers or supporters."  The policy also provides that, "[f]or purposes of this definition: (1) notices that are published include material placed on the Internet or on similar electronic

15

means of communications; and (2) regarding web-sites, only that part of a web-site that is about **your** goods, products or services for the purpose of attracting customers or supporters is considered an **advertisement**." (**Exhibit B**, page 16 of 23.)

43.     Other definitions and terms relevant to the coverage provided by National Union under the Commercial Umbrella Liability Policy include, but are not limited to, "**Loss**," which is defined as "those sums actually paid as judgement or settlements" (**Exhibit B**, page 19 of 23); "**Occurrence**," which "means: . . . as respects **Personal Injury and Advertising Injury**, an offense arising out of your business that causes **Personal Injury and Advertising Injury**.  All damages that arise from the same, related or repeated injurious material or act will be deemed to arise out of one **Occurrence**, regardless of the frequency or repetition thereof, the number and kind of media used and the number of claimants."  (**Exhibit B**, page 20 or 23); and "**Personal Injury and Advertising Injury**," which "means injury arising out of your business [and] one or more of the following offenses: . . . (7) infringement upon another's copyright, trade dress or slogan in your **Advertisement** (Exhibit B, page 21 of 23).

**Acts and Omissions of Insurers Following Notice of Claim**

44.    The Claim was timely tendered to AISLIC by AGHI and the Amway Interests.

45.    AGHI and the Amway Interests have satisfied the threshold requirements necessary to trigger the AISLIC Internet & Network Security Policy.

46.    AISLIC denied coverage for the Claim and has refused to recant its denial of coverage.

47.    The Claim was timely tendered to National Union by AGHI and the Amway Interests.

48.    AGHI and the Amway Interests have satisfied the threshold requirements necessary to trigger the National Union Commercial Umbrella Liability Policy.

49.    National Union issued a reservation of rights, and said that it is investigating the Claim, but has neither denied the Claim nor agreed to provide coverage for the Claim, despite the passage of four (4) years.

## FIRST CAUSE OF ACTION

(Breach of Contract - AISLIC)

50.    AGHI repeats and realleges the allegations set forth in paragraphs 1 through 49 of this Complaint as if fully set forth herein.

17

51.    The Internet & Network Security Insurance Policy constitutes a valid and enforceable contract between AGHI and AISLIC, in which AGHI is the named insured and the Amway Interests are insureds under the policy.

52.    AGHI has paid all premiums, provided prompt notice of the Claim to AISLIC, and otherwise performed all obligations required of it under the Internet & Network Security Insurance Policy.

53.    Under the terms of the Internet & Network Security Insurance Policy, AISLIC must provide coverage for "those amounts, in excess of the applicable **Retention**, [AGHI and the Amway Interests] are legally obligated to pay, . . . as **damages**, resulting from any **claim(s)** made against [the Amway Interests] for [their] **wrongful act(s)** in the display of **Internet media**. (**Exhibit A**, page 1.)

54.    Under the terms of the Internet & Network Security Insurance Policy, AISLIC was further obligated to defend the Amway Interests against the Underlying Litigation and, in doing so, pay all "**claim expenses**" related thereto, including but not limited to all reasonable and necessary attorney fees.  (**Exhibit A**, pages 1-2.)

55.    As detailed above, the facts of the Claim come within the coverage grant of the Internet & Network Security Insurance Policy.

56.    As detailed above, AGHI did not breach any condition of the Internet & Network Security Insurance Policy.

57.    As detailed above, neither the Claim nor the Loss is excluded by the Internet & Network Security Insurance Policy.

58.    AISLIC has not paid any amounts to or on behalf of AGHI in connection with the Claim or the Loss.

59.    By failing to provide coverage for the Claim and the Loss, including a defense against the Underlying Litigation, AISLIC has breached the terms and conditions of the Internet & Network Security Insurance Policy.

60.    As a direct and proximate result of AISLIC's breach of the Internet & Network Security Insurance Policy, AGHI has suffered damages in the amount of the policy's $25,000,000 Limit of Liability, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law.

## SECOND CAUSE OF ACTION

(Breach of Contract – National Union)

61.    AGHI repeats and realleges the allegations set forth in paragraphs 1 through 60 of this Complaint as if fully set forth herein.

62.   The Commercial Umbrella Liability Policy constitutes a valid and enforceable contract between AGHI and National Union in which AGHI is the named insured and the Amway Interests are insureds under the policy.

63.   AGHI has paid all premiums, provided prompt notice of the Claim, and otherwise performed all obligations required of it under the Commercial Umbrella Liability Policy.

64.   Under the terms and conditions of the Commercial Umbrella Liability Policy, National Union must "pay on behalf of [AGHI and the Amway Interests] those sums in excess of the **Retained Limit** that [AGHI and the Amway Interests] become[] legally obligated to pay as damages by reason of liability imposed by law because of . . . . **Personal Injury and Advertising Injury** to which th[e] insurance applies."  (**Exhibit B**, page 1 of 23.)

65.   As detailed above, the facts of the Claim come within the coverage grant of the Commercial Umbrella Liability Policy.

66.   As detailed above, AGHI did not breach any condition of the Commercial Umbrella Liability Policy.

67.   As detailed above, neither the Claim nor the Loss is excluded by the Commercial Umbrella Liability Policy.

20

68.   National Union has not paid any amounts to or on behalf of AGHI in connection with the Claim or the Loss.

69.   By failing to provide coverage for the Claim and the Loss, National Union has breached the terms and conditions of the Commercial Umbrella Liability Policy.

70.   As a direct and proximate result of National Union's breach of the Commercial Umbrella Liability Policy, AGHI has suffered damages in an amount in excess of $5,000,000 up to the Commercial Umbrella Liability Policy's Limits of Liability of $50,000,000, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law.

## THIRD CAUSE OF ACTION

(Declaratory Relief - AISLIC)

71.   AGHI repeats and realleges the allegations set forth in paragraphs 1 through 70 of this Complaint as if fully set forth herein.

72.   Under the terms of Internet & Network Security Insurance Policy, AISLIC must provide coverage for "those amounts [AGHI and the Amway Interests] are legally obligated to pay, as **damages**, . . . , resulting from any **claims(s)** made against [the Amway Interests] for [the Amway Interests'] **wrongful act(s)** in the display of **Internet media**.  (**Exhibit A**, page 1.)

73.   Under the terms of the Internet & Network Security Insurance Policy, AISLIC was further obligated to defend the Amway Interests against the Underlying Litigation and, in doing so, pay all "**claim expenses**" related thereto, including but not limited to all reasonable and necessary attorney fees.  (**Exhibit A**, pages 1-2.)

74.   As detailed above, the facts and allegations of the Claim come within the coverage grant of the Internet and Network Security Insurance Policy.

75.   As detailed above, AGHI did not breach any condition of the Internet and Network Security Insurance Policy.

76.   As detailed above, neither the Claim nor the Loss is excluded by the Internet & Network Security Insurance Policy.

77.   AISLIC disputes its legal obligation to pay the Claim and the Loss.

78.   A judicial determination of the Internet & Network Security Insurance Policy's scope is therefore appropriate and necessary pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57.

79.   An actionable and justiciable controversy exists between AGHI and AISLIC concerning the proper construction of the Internet & Network Security Insurance Policy, and the rights and obligations of the parties

22

thereto, with respect to the Claim and the Loss sustained by AGHI and the Amway Interests.

80.    AGHI is entitled to a declaration that there is coverage available for the Claim and the Loss under the Internet & Network Security Insurance Policy, and any other relief this Court deems proper.

## FOURTH CAUSE OF ACTION

(Declaratory Relief – National Union)

81.    AGHI repeats and realleges the allegations set forth in paragraphs 1 through 80 of this Complaint as if fully set forth herein.

82.    Under the terms of the "Commercial Umbrella Liability Policy", National Union must "pay on behalf of [AGHI and the Amway Interests] those sums in excess of the **Retained Limit** that [AGHI and the Amway Interests] become[] legally obligated to pay as damages by reason of liability imposed by law because of . . . . **Personal Injury and Advertising Injury** to which th[e] insurance applies."  (**Exhibit B**, page 1 of 23.)

83.    As detailed above, the facts of the Claim come within the coverage grant of the Commercial Umbrella Liability Policy.

84.    As detailed above, AGHI did not breach any condition of the Commercial Umbrella Liability Policy.

23

85.   As detailed above, neither the Claim nor the Loss is excluded by the Commercial Umbrella Liability Policy.

86.   National Union disputes its legal obligation to pay the Claim and the Loss.

87.   A judicial determination of the Commercial Umbrella Liability Policy's scope is therefore appropriate and necessary pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57.

88.   An actionable and justiciable controversy exists between AGHI and National Union concerning the proper construction of the Commercial Umbrella Liability Policy, and the rights and obligations of the parties thereto, with respect to the Claim and the Loss sustained by AGHI and Amway Interests.

89.   AGHI is entitled to a declaration declaring that there is coverage available for the Claim and the Loss under the Commercial Umbrella Liability Policy, and any other relief this Court deems proper.

## **FIFTH CAUSE OF ACTION**

(Violation of Michigan's Compiled Law 500.2006 - AISLIC)

90.   AGHI repeats and realleges the allegations set forth in paragraphs 1 through 89 of this Complaint as if fully set forth herein.

91.    AISLIC is required to act in good faith with respect to its contractual duties and obligations under the Internet & Network Security Insurance Policy.

92.    AISLIC intentionally disregarded the interests of AGHI and the Amway Interests, and has wrongfully maintained its baseless policy defenses in order to protect its own financial interest at the expense of AGHI.

93.    Pursuant to the Uniform Trade Practices Act, specifically MCL 500.2006(1):

> A person must pay on a timely basis to its insured, an individual or entity directly entitled to benefits under its insured's contract of insurance, or a third party tort claimant the benefits provided under the terms of its policy, or, in the alternative, the person must pay to its insured, an individual or entity directly entitled to benefits under its insured's contract of insurance, or a third party tort claimant 12% interest, as provided in subsection (4), on claims not paid on a timely basis.  Failure to pay claims on a timely basis or to pay interest on claims as provided in subsection (4) is an unfair trade practice unless the claim is reasonably in dispute."

94.    Pursuant to MCL 500.2006(4), if benefits are not paid on a timely basis, an insurer shall be liable for simple interest at a rate of 12% per annum on the unpaid amount from a date sixty (60) days after satisfactory proof of loss was received by the insurer.

95.    AGHI has provided satisfactory proof of its covered Claim and Loss.

96.    The amount of AGHI's Loss has not been in dispute and, yet, remains unpaid.

97.    AISLIC's failure to pay AGHI's Loss on a timely basis was undertaken in bad faith and in clear violation of the Uniform Trade Practices Act.

## SIXTH CAUSE OF ACTION

(Violation of Michigan's Compiled Law 500.2006 – National Union)

98.    AGHI repeats and realleges the allegations set forth in paragraphs 1 through 97 of this Complaint as if fully set forth herein.

99.    National Union is required to act in good faith with respect to its contractual duties and obligations under the Commercial Umbrella Liability Policy.

100.  National Union intentionally disregarded the interests of AGHI and the Amway Interests, and has wrongfully failed to accept coverage for the Claim and the Loss under the Commercial Umbrella Liability Policy in order to protect its own financial interest at the expense of AGHI.

101.  Pursuant to the Uniform Trade Practices Act, specifically MCL 500.2006(1):

Case 1:17-cv-00388-RJJ-RSK   ECF No. 1,  PageID.27   Filed 04/27/17   Page 27 of 35


> A person must pay on a timely basis to its insured, an individual
> or entity directly entitled to benefits under its insured's contract
> of insurance, or a third party tort claimant the benefits provided
> under the terms of its policy, or, in the alternative, the person
> must pay to its insured, an individual or entity directly entitled to
> benefits under its insured's contract of insurance, or a third
> party tort claimant 12% interest, as provided in subsection (4),
> on claims not paid on a timely basis.  Failure to pay claims on a
> timely basis or to pay interest on claims as provided in
> subsection (4) is an unfair trade practice unless the claim is
> reasonably in dispute."

102.  Pursuant to MCL 500.2006(4), if benefits are not paid on a timely basis, an insurer shall be liable for simple interest at a rate of 12% per annum on the unpaid amount from a date sixty (60) days after satisfactory proof of loss was received by the insurer.

103.  AGHI has provided satisfactory proof of its covered Claim and Loss.

104.  The amount of AGHI's Loss has not been in dispute and, yet, remains unpaid.

105.  National Union's failure to pay AGHI's Loss on a timely basis was undertaken in bad faith and in clear violation of the Uniform Trade Practices Act.

27

## SEVENTH CAUSE OF ACTION

(Common Law Breach of the Implied Covenant of

Good Faith and Fair Dealing - AISLIC)

106. AGHI repeats and realleges the allegations set forth in paragraphs 1 through 105 of this Complaint as if fully set forth herein.

107. As discussed herein above, AISLIC is obligated to pay the Claim and AGHI's Loss under AISLIC's Internet & Network Security Insurance Policy.  However, despite this obligation, AISLIC has failed and refused, and continues to fail and refuse, to pay AGHI the benefits and reimbursement due under the Internet & Network Security Insurance Policy for the Claim and the Loss, without any reasonable basis in law or fact for its failure and refusal.  AISLIC knows that no basis exists for its failure and refusal to pay the Claim and AGHI's Loss, and AISLIC has acted with reckless disregard of the duties and obligations it owes to AGHI.

108.  AISLIC has failed and/or refused to pay the Loss owed to AGHI under the Internet & Network Security Insurance Policy, and used deceptive and fraudulent means to frustrate AGHI's right to receive the Internet and Network Security Insurance Policy's benefits and to promptly receive compensation for the Claim and Loss.

109. AISLIC's failure to timely and reasonably discharge its responsibilities owed under the Internet & Network Security Insurance Policy constitutes a breach of the covenant of good faith and fair dealing implied in every contract.

110. As detailed herein above, AISLIC has refused to alter its coverage position despite unrefuted evidence that the alleged bases supporting that position are incorrect, and has refused to pay the sums under the Internet & Network Security Insurance Policy that are clearly due and owing.

111. AGHI and AISLIC contemplated as part of the negotiation and placement of the Internet & Network Security Insurance Policy that if AISLIC breached its duties and obligations under the Internet & Network Security Insurance Policy, AGHI would be forced to incur and sustain consequential damages naturally flowing from that breach, including, but not limited to, the attorneys' fees, costs, and expenses needed to enforce the terms and conditions of the Internet & Network Security Insurance Policy – the reason AGHI purchased the Internet & Network Security Insurance Policy and paid the associated premium.

112. As a result of the aforementioned acts and omissions by AISLIC, AGHI has suffered, and will continue to suffer, economic damages

as detailed above, including but not limited to the attorneys' fees, costs, and expenses incurred in prosecuting this matter to collect the benefits due and owing under the Internet & Network Security Insurance Policy.

113. The acts and omissions of AISLIC as described herein evidence an evil motive and reckless indifference to the rights of AGHI, entitling AGHI to an award of punitive damages.

## **EIGHTH CAUSE OF ACTION**

(Common Law Breach of the Implied Covenant of

Good Faith and Fair Dealing – National Union)

114. AGHI repeats and realleges the allegations set forth in paragraphs 1 through 113 of this Complaint as if fully set forth herein.

115. As discussed herein above, National Union is obligated to pay the Claim and AGHI's Loss under the Commercial Umbrella Liability Policy. However, despite this obligation, National Union has failed and/or refused, and continues to fail and/or refuse, to pay AGHI the benefits and reimbursement due under the Commercial Umbrella Liability Policy, without any reasonable basis in law or fact for its failure and/or refusal. National Union knows that no basis exists for its failure and/or refusal to pay the

Claim and AGHI's Loss, and National Union has acted with reckless disregard of the duties and obligations it owes to AGHI.

116. National Union has failed and/or refused to pay the monies owed to AGHI under the Commercial Umbrella Liability Policy, and used deceptive and fraudulent means to frustrate AGHI's right to receive the Commercial Umbrella Liability Policy's benefits and to promptly receive compensation for the Claim and AGHI's Loss.

117. National Union's failure to timely and reasonably discharge its responsibilities owed under the Commercial Umbrella Liability Policy constitutes a breach of the covenant of good faith and fair dealing implied in every contract.

118. As detailed herein above, National Union has refused to accept coverage for the Claim and the Loss under the Commercial Umbrella Liability Policy despite unrefuted evidence that its failure to do so is inappropriate and incorrect, and has refused to pay the Loss under the Commercial Umbrella Liability Policy despite the fact that it is clearly due and owing.

119. AGHI and National Union contemplated as part of the negotiation and placement of the Commercial Umbrella Liability Policy that if National Union breached its duties and obligations under the Commercial

Umbrella Liability Policy, AGHI would be forced to incur and sustain consequential damages naturally flowing from that breach, including, but not limited to, the attorneys' fees, costs, and expenses needed to enforce the terms and conditions of the Commercial Umbrella Liability Policy – the reason AGHI purchased the Commercial Umbrella Liability Policy and paid the associated premium.

120. As a result of the aforementioned acts and omissions by National Union, AGHI has suffered and will continue to suffer economic damages as detailed above, including, but not limited to, the attorneys' fees, costs and expenses incurred in prosecuting this matter to collect the benefits due and owing under the Commercial Umbrella Liability Policy.

121.  The acts and omissions of National Union as described herein evidence an evil motive and reckless indifference to the rights of AGHI, entitling AGHI to an award of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, AGHI prays for relief as follows:

(a)    On the First Cause of Action, AGHI requests that the Court enter judgment against AISLIC, awarding AGHI damages in the amount of the Internet & Network Security Insurance Policy's Limits of Liability of

$25,000,000, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law;

(b)    On the Second Cause of Action, AGHI requests that the Court enter judgment against National Union, awarding AGHI damages in an amount in excess of $5,000,000 up to the Commercial Umbrella Liability Policy's Limits of Liability of $50,000,000, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law;

(c)    On the Third Cause of Action, AGHI requests that this Court enter a declaratory judgment in favor of AGHI against AISLIC, declaring that AISLIC is obligated to pay AGHI the $25,000,000 Limit of Liability under the Internet and Network Security Insurance Policy for the Claim and AGHI's Loss;

(d)    On the Fourth Cause of Action, AGHI requests that this Court enter a declaratory judgment in favor of AGHI against National Union, declaring that National Union is obligated to pay AGHI under the Commercial Umbrella Liability Policy an amount in excess of $5,000,000 up to the Commercial Umbrella Liability Policy's Limits of Liability of $50,000,000 for the Claim and AGHI's Loss;

33

(e)     On the Fifth Cause of Action, AGHI requests that this Court award to AGHI interest against AISLIC as called for under MCL 500.2006;

(f)     On the Sixth Cause of Action, AGHI requests that this Court award to AGHI interest against National Union as called for under MCL 500.2006;

(g)     On the Seventh Cause of Action, AGHI requests that this Court award punitive damages to AGHI and against AISLIC, as well as the attorneys' fees, costs, and expenses incurred in prosecuting this matter;

(h)     On the Eighth Cause of Action, AGHI requests that this Court award punitive damages to AGHI and against National Union, as well as the attorney's fees, costs, and expenses incurred in prosecuting this matter; and

(i)     Additionally, AGHI requests such other and further relief against AISLIC and National Union as the Court deems just and proper.

## JURY DEMAND

Plaintiff, Alticor Global Holdings Inc., hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated:  April 27, 2017                WILSONYOUNG PLC

/s/ James D. Wilson
Attorneys for Plaintiff
ALTICOR GLOBAL HOLDINGS INC.
James D. Wilson (P41338)
Two Towne Square, Suite 901
Southfield, Michigan 48076
(313) 983-1234
jwilson@wilsonyoungplc.com