UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALTICOR GLOBAL HOLDINGS, INC.,
AMWAY CORP., ALTICOR, INC., and
AMWAY INTERNATIONAL, INC.,

       Plaintiffs/Counter-Defendants,

                                     CASE NO. 1:17-CV-388

v.

                                     HON. ROBERT J. JONKER

AMERICAN INTERNATIONAL
SPECIALTY LINES INSURANCE
COMPANY (n/k/a AIG Specialty
Insurance Company),

       Defendant, and

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA,

       Defendant/Counter-Plaintiff.

_____/

## OPINION AND ORDER

      This is an insurance coverage case. The parties have framed a series of issues on cross

motions for summary judgment or partial summary judgment. Plaintiffs Alticor Global Holdings,

Inc., Amway Corp., Alticor Inc., and Amway International (collectively, "Amway")[1] contend that

Defendants American Lines Insurance Company ("AISLIC") and National Union Fire Insurance

Company of Pittsburgh, PA ("National Union") breached insurance agreements with Amway by

denying coverage to which Amway was entitled under the relevant policies, and refusing to

provide a defense or to reimburse defense and claim expenses. AISLIC and National Union argue

---

[1] Plaintiff Alticor Global Holdings, Inc. is a holding company, and Plaintiffs Amway Corp., Alticor Inc., and Amway International are among its subsidiaries. For ease of reference, this Opinion refers to all four plaintiffs, individually and collectively, as "Amway."

that their defense obligation was never triggered, or was eliminated by policy exclusions applicable as a matter of law. The Court has heard oral argument on the motions and thoroughly reviewed the record. This is the decision of the Court.

BACKGROUND

A.    *The 1996 Copyright Litigation*

Amway is a longstanding international direct selling venture. Amway Independent Business Owners, or "IBOs," market and sell Amway products worldwide. In 1996, a group of entertainment companies (the "Record Companies") sued Amway and approximately fifty IBOs in federal court in the Middle District of Florida for copyright infringement (the "1996 Litigation"). In the 1996 Litigation, the Record Companies accused approximately fifty defendant IBOs of direct copyright infringement, and they charged Amway with vicarious or contributory liability. The Record Companies alleged that the defendant IBOs produced videotapes incorporating sound recordings to which the Record Companies held copyrights. (ECF No. 71-3, PageID.2872.) According to the Record Companies, the defendant IBOs produced the videotapes to use as "motivational tools, as sales tools, to recruit new Distributors and to promote upcoming Amway Distributor conventions and conferences." (*Id.*) The Record Companies claimed that defendant IBOs sold the infringing videotapes at "Amway conventions and conferences, through the mails, and otherwise." (*Id.*) They alleged that defendant IBOs generated income not only by selling the videotapes, but also by using the videotapes to advertise rallies and conventions; encourage other IBOs to recruit distributors and buy and sell motivational tools; motivate participants at rallies and conventions; and advertise Amway products. (*Id.*, PageID.2873.) The Record Companies asserted that the defendant IBOs reaped a substantial portion of their profits from the sale of the infringing videotapes they produced and other motivational tools. (*Id.*)

2

In March 1998, the parties settled the 1996 Litigation under a Settlement and Release Agreement (the "1998 Settlement"). The 1998 Settlement resolved claims for past infringement; it did not release Amway or IBOs from claims of infringement arising in the future. It did, however, provide a framework for addressing potential future claims. The U.S. District Court for the Middle District of Florida retained jurisdiction to enforce the 1998 Settlement.

B.     *The Internet Video Copyright Claim*

Fourteen years passed. In November 2012, the Record Companies sent Amway a letter accusing it of infringing hundreds of copyrighted sound recordings (the "2012 Letter"). The Record Companies expanded the allegations in 2013 and ultimately accused Amway of direct, contributory, or vicarious liability for the infringement of hundreds of sound recordings used in over 1,000 different videos uploaded to Internet sites (the "Internet Video Claim"). The 2012 Letter explicitly invokes the dispute process created by the 1998 Settlement:

> This letter constitutes notice pursuant to Paragraph 13.2 of the Settlement and Release Agreement that [the Record Companies] reasonably believe that activities or conduct on the part of Amway Corporation and distributors of Amway products, as well as various individuals and entities associated with them, infringe copyrights and other rights in sound recordings owned or controlled by one or more of [the Record Companies].

(ECF No. 71-9, PageID.3085) (bold and italics omitted).

The 2012 Letter asserts that infringing sound recordings "are incorporated into videos . . . which are synchronized and further uploaded by Amway Corporation distributors [and others connected to Amway] to various websites and then performed and distributed to the public." (*Id.*, PageID.3086.) The 2012 Letter specifies multiple websites and user channels it says feature infringing video content. (*Id.*) According to the 2012 Letter, "many of these videos, as well as the user 'channels' and/or profiles from which they are offered, incorporate the Amway logo and

3

contain links or otherwise direct traffic to and from official Amway websites." (*Id.*) The 2012 Letter describes the alleged infringements as willful and contends that "at the direction and instruction of Amway Corporation, the Internet has to a large extent significantly enhanced the marketing and advertising practices that were the subject of the previous lawsuit [the 1996 Litigation]." (*Id.*, PageID.3087-3088.) The 2012 Letter sketches potential damages for the alleged infringements, including the license value of the infringed recordings; profits attributable to the infringement; or statutory damages for willful infringement. (*Id.*, PageID.3089.)

        C.    *Amway's Coverage Requests*

On May 21, 2013, Amway tendered the 2012 Letter to AISLIC, seeking coverage under a policy entitled "AIG netAdvantage Security – Internet & Network Security Insurance" (the "AISLIC Policy"). (ECF No. 71-14.) AISLIC denied coverage in July 2013 under a series of such policies issued from 1999 through 2008.[2] (*Id.*) AISLIC provided three primary reasons for the denial: (1) coverage does not extend to infringements on websites other than those of Amway and its distributors or licensees; (2) Exclusion J bars coverage for claims, wrongful acts, or loss arising out of the 1996 Litigation; (3) Exclusion P bars coverage for claims arising out of any circumstance or occurrence if claims arising out of the same circumstance or occurred have been reported under a preceding policy. (*Id.*) AISLIC reaffirmed the denial of coverage by letter of December 4, 2013, emphasizing the same points. (ECF No. 71-15.) AISLIC issued another denial on March 25, 2014, denying coverage "for the reasons previously detailed." (ECF No. 71-16, PageID.3242.) AISLIC did not state in any of the notices that it was denying coverage or a defense because the 2012 Letter was not a "suit" that triggered coverage.

---

[2] In this lawsuit, Amway contends it is entitled to coverage under the AISLIC Policy with effective dates from July 1, 2006 – July 1, 2007, extended by endorsement to July 20, 2007, Policy No. 672-91-00.

Amway also reported the Internet Video Claim to National Union under umbrella policies spanning policy years 2005-2011.[3] National Union responded by letter dated November 26, 2018, stating that

> this letter serves to request additional information, and to reserve National Union's rights under the 2005-11 umbrella policies, including, but not limited to, the right to decline coverage or seek declaratory relief at a subsequent time, based on the terms, definitions, conditions and exclusions of the policies for all or certain aspects of this matter.

(ECF No. 103-7, PageID.6255.) National Union advised that as to the 2005-2011 policy years, it was reserving its right to deny coverage to the extent Amway's liability does not involve an offense arising out of a Named Insured's business. (*Id.*, PageID.6259.) National Union also noted that to implicate coverage, the advertising injury "must be caused by an Occurrence committed during the 2005-11 umbrella policies' respective policy periods" and that National Union

> reserves all rights, including the right to limit or deny coverage under the 2005-11 umbrella policies to the extent the claimants' copyright infringement claims do not seek damages because of **Personal Injury and Advertising Injury** caused by an **Occurrence** committed during the 2005-11 umbrella policies' respective policy periods.

(*Id.*) The letter identifies multiple potential coverage exclusions as to which National Union states it reserves its rights. (*Id.*, PageID.6259-60.) The letter does not take a definite coverage position regarding the 2005-2011 umbrella policies. Instead, it requests more information and states that "National Union hereby fully and completely reserves its rights with respect to the claimants' copyright infringement claims under the 2005-11 umbrella policies, including the right to decline coverage at a later date, if warranted." (*Id.*, PageID.6260.) National Union states that it reserves "the right to assert additional defenses to any claims for coverage." (*Id.*, PageID.6261.) National

---

[3] In this lawsuit, Amway contends it is entitled to coverage under the National Union Policy entitled "Umbrella Prime-Commercial Umbrella Liability Policy" with effective dates April 1, 2006 – April 1, 2007, Policy No. 4485305.

Union also requests that Amway advise it of "any impairment of the umbrella policies' **Retained Limits**." (*Id.*)

In correspondence dated December 1, 2014, National Union asked that Amway keep it advised of any developments in the Florida Litigation. (ECF No. 103-8, PageID.6272.) By letter of January 5, 2016, National Union asked for more comprehensive materials. (*Id.*, PageID.6273-75.) National Union stated that it "continue[s] to reserve the right to assert additional defenses to any claims for coverage" and that it "expressly reserve[s] all rights under [its] policies and at law." (*Id.*, PageID.6274-75.) According to Amway, National Union neither denied or agreed to provide coverage for the Internet Video Claim until after Amway filed the lawsuit now before this Court. (ECF No. 27, PageID.412.) National Union now contends that Amway is not entitled to coverage for the Internet Video Claim.

D.      *Florida Litigation*

In April 2014, Amway filed suit against the Record Companies in the United States District Court for the Middle District of Florida (the "Florida Litigation"). Amway alleged, among other things, breach of the 1998 Settlement. In March 2015, the Record Companies filed counter-claims for breach of contract and direct, contributory, and vicarious copyright infringement (the "2015 Counter-claim" or "Counter-claim"). (ECF No. 72-18.) The parties ultimately settled the Florida Litigation, and the court dismissed the case with prejudice on January 4, 2017. Neither AISLIC nor National Union provided any defense or indemnity for Amway in connection with the Internet Video Claim. Each insurer denied coverage to Amway based on the insurer's reading of governing policy language.

E.      *Current Dispute*

6

Amway now sues AISLIC and National Union based on claims arising out of the insurers' denial of coverage. Before the Court are the parties' cross motions for summary judgment or partial summary judgment.

## LEGAL STANDARDS

Summary judgment is proper where the evidence presents no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A fact is material if it is so defined by substantive law and will affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute exists if the court finds that a reasonable jury could find in favor of the non-moving party. *Id.* Summary judgment is required where "after adequate time for discovery and upon motion … a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding a motion for summary judgment, the court draws all inferences in the light most favorable to the non-moving party. *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992).

Michigan substantive law applies in this case.  Michigan courts "construe an insurance policy in the same manner as any other species of contract, giving its terms their ordinary and plain meeting if such would be apparent to a reader of the instrument." *DeFrain v. State Farm Mut. Auto. Ins. Co.*, 491 Mich. 359, 367, 817 N.W. 2d 504 (2012) (internal quotation marks omitted). Courts "must look at the contract as a whole and give meaning to all terms." *Auto-Owners Ins. Co. v. Churchman*, 440 Mich. 560, 566, 489 N.W.2d 431 (1992). Michigan courts "interpret[] the words used in a contract in accordance with their commonly used meanings." *Citizens Ins. Co. v. Pro-Seal Service Group, Inc.*, 477 Mich. 75, 84, 730 N.W. 2d 682 (2007) (internal quotation

omitted). "After ascertaining the meaning of a contract's terms, 'a court must construe and apply unambiguous contract provisions as written.'" *Auto Owners Ins. Co. v. Seils*, 310 Mich. App. 132, 145, 871 N.W. 2d 530 (2015) (quoting *Rory v. Continental Ins. Co.*, 473 Mich. 457, 461, 464, 703 N.W. 2d 23 (2005). Ambiguity exists if, after considering the whole contract, one fair reading leads to the understanding that coverage applies under certain circumstances and another fair reading leads to the conclusion that coverage does not apply under the same circumstances. *Id.* at 146. Michigan courts construe an ambiguous provision in an insurance contract against the insurer and in favor of coverage. *Id.* The insured bears the burden of demonstrating that its claim falls within the policy's coverage terms. *Id.* The insurer has the burden of establishing that an exclusion applies. *Id.*

Under Michigan law, "an insurer has a duty to defend, despite theories of liability asserted against the insured that are not covered under the policy, if there are any theories of recovery that fall within the policy." *Hastings Mut. Ins. Co. v. Mosher Dolan Cataldo & Kelly, Inc.*, 497 Mich. 919, 920, 856 N.W.2d 550 (2014). "The duty to defend cannot be limited by the precise language of the pleadings." *Am. Bumper and Mfg. Co. v. Hartford Fire Ins. Co.*, 452 Mich. 440, 452, 550 N.W. 2d 475 (1996) (quotation omitted). "The insurer has the duty to look behind the third party's allegations to analyze whether coverage is possible." *Id.* (quotation omitted). "In a case of doubt as to whether … the complaint against the insured alleges a liability of the insurer under the policy, the doubt must be resolved in the insured's favor." *Id.* (quotation omitted). The duty to defend is broader in scope than the duty to indemnify. *Id.*, at 451.

## AISLIC POLICY ISSUES[4]

---

[4] The Court addresses in this Opinion only a limited range of issues framed by the parties' motions. The parties all have other policy issues they have reserved for later stages of the litigation. The Court, in similar fashion, is ruling only on the limited issues addressed in this Opinion at this time.

### A. Exclusions J and P

AISLIC asserts that even assuming the AISLIC Policy would otherwise cover Amway's

claim, policy exclusions bar coverage as a matter of law.

Exclusions J and P state that under the AISLIC Policy's Internet Media Liability Coverage,

> **we** will not cover any **claim**, **wrongful act**, or **loss** alleging, arising out of, or resulting, directly or indirectly, from
>
>  ….
>
> J.        any **claim**, demand, **suit**, arbitration, mediation, litigation, or administrative, bankruptcy, or regulatory proceeding or investigation, prior to or pending as of the **first inception date**; or alleging or arising out of or relating to any fact, circumstance, situation or **wrongful act** alleged in such **claim**, demand, **suit**, arbitration, mediation, litigation, or administrative, bankruptcy, or regulatory proceeding or investigation.
>
> ….
>
> P.        any circumstance or occurrence that has been reported to an insurer on, or is covered under, any other policy of insurance prior to the inception date of this policy; or alleging or arising out of the same **wrongful act** or series of continuous, repeated or related **wrongful acts** or alleging the same or similar facts, alleged or contained in any **claim** that has been reported, or any **wrongful act(s)** of which notice has been given, under any policy of which this policy is a replacement or succeeds in time.

(ECF No. 71-7, PageID.3019-3021.) AISLIC posits that the Internet Video Claim arose out of the

1996 Litigation and falls squarely within the Exclusions, precluding coverage and eliminating the

duty to defend as a matter of law.

The Court disagrees with AISLIC. Applying Michigan's general duty to defend rules,

AISLIC had a duty to defend any suit arising out of the Internet Video Claim unless and until it

can exclude potential coverage for the claim in its entirety. The record does not support a total

exclusion as a matter of law. To the contrary, the Internet Video Claim addresses different

technology, different time periods, different copyrighted works, and different IBOs than those

involved in the 1996 Litigation. For example, the 2012 Letter references "more than **365** infringing

9

videos" of which only "**approximately 25** … incorporate sound recordings that also were at issue in the previous lawsuit…." (ECF No. 71-9, PageID.3087.) (emphasis added). The 1996 Litigation alleged infringement involving **116** different sound recordings, while the 2012 Letter alleges infringement involving "more than **220** different sound recordings." (*Id.*, PageId.3086-87.) The 2012 Letter notes that one of the parties bringing the Internet Video Claim, Warner Music Group Corp. was not even a party to the 1996 Litigation, but instead submitted voluntarily to the ADR procedure. (*Id.*, PageID.3086.) Allegations in the Internet Video Claim differ in other key respects from the allegations in the 1996 Litigation, involving different IBOs; different media technologies; and different business platforms. The record further suggests that alleged infringements in the 1996 Litigation occurred principally in business support materials ("BSM") IBOs produced and distributed themselves, while alleged infringements in the Internet Video Claim primarily promoted Amway's own branding and marketing initiative. In short, at least some of the allegations of the Internet Video Claim fall outside the exclusions. Accordingly, AISLIC had a duty to defend, and its motion for judgment as a matter of law fails.

AISLIC argues that even if time frames, technologies, IBOs, and copyrighted works are different, the exclusions still apply because the 1998 Settlement Agreement included a prospective dispute resolution process for future copyright claims. Indeed, the Record Companies submitted their initial 2012 Letter as a part of the process. And Amway actually initiated a lawsuit in 2014 that accused the Record Companies of breaching the Settlement Agreement by saving up years' worth of alleging infringements for a single demand, rather than presenting issues as they arose along the way in a mutual effort to nip issues in the bud, provide better protection of copyrighted works, and mitigate potential damages for everyone. Because both Amway and the Record

Companies referenced or used the special process created by the 1998 Settlement Agreement, AISLIC says the new Internet Video Claim necessarily falls within Exclusions J and P.

Again, the Court disagrees with AISLIC. Amway and the Record Companies structured a special procedure for addressing future disputes that might arise between them. The process that Amway and the Record Companies structured was perhaps more comprehensive than most ADR processes that commercial parties regularly include in their contracts. But the basic purpose was no different: coming up with a process to address disputes that have not yet arisen in ways short of traditional litigation. The Court would be loath to discourage such arrangements by finding that a policyholder risked exclusion of liability coverage under provisions such as those cited by AISLIC.

The language of the policy exclusions does not support such a far-reaching result. The exclusions focus on precluding coverage for liability-causing conduct that had already ripened into an actual dispute, or notice of potential dispute at the time the AISLIC Policy incepted. This naturally excludes coverage for any new damages claimed to arise out of one of the infringements identified in the 1996 Litigation, and may (or may not) be broad enough to exclude coverage for new alleged infringements of works that were also at issue in the 1996 Litigation. But the coverage does not exclude coverage for alleged infringements of works that were never at issue in the 1996 Litigation, particularly when the alleged infringements were by IBOs not previously involved; using technology not at issue in the 1996 Litigation; and at times post-dating the 1998 Settlement.

### B. Triggering the Duty to Defend

The parties dispute the trigger for AISLIC's duty to defend. Potential triggering events include the 2012 Letter, the filing of the complaint in the Florida Litigation, and the filing of the Counter-claim. Amway asserts that AISLIC's duty to defend was triggered when Amway tendered

11

the 2012 Letter to AISLIC. AISLIC argues that any duty to defend was triggered, at the earliest,

upon the Record Company filing of the Counter-claim in 2015.

### 1. Policy Provisions

Several policy provisions potentially apply. Under the heading "Internet Media Liability

Coverage," the Policy states:

> **We** shall pay on **your** behalf those amounts, in excess of the applicable
> **Retention**, you are legally obligated to pay, including liability **assumed**
> **under contract**, as **damages**, resulting from any **claim(s)** made against
> **you** for **your wrongful act(s)** in the display of **Internet media**.  Such
> **wrongful act(s)** must occur during the **policy period**.

(ECF No. 71-7, PageID.3009.) Under the heading "Defense Costs, Charges, and Expenses," the

Policy provides,

> **We** have the right and duty to defend a **suit** brought against you for
> covered **wrongful acts**, even if the **suit** is groundless or fraudulent and,
> with **your** written consent, settle any suit if **we** believe that it is proper.
> ….
> **We** shall pay **claim expenses** you incur with **our** prior written consent in
> the defense of a suit for covered wrongful acts.  In addition, **we** may, but
> are not obligated to, pay **claim expenses** with respect to a claim that is not
> a suit….

(*Id.*, PageID.3009-3010.) The AISLIC Policy defines "claim" as "(1) a written or oral demand for

money, services, non-monetary relief or injunctive relief [or] (2) a **suit**…."  (*Id.*, PageID.No.

3011.) The AISLIC Policy defines "wrongful acts" to include, without limitation, "(1) any actual

or alleged breach of duty, neglect, act, error, misstatement, misleading statement, or omission that

results in … (b) an infringement of copyright…."  (*Id.*, PageID.3018.) The AISLIC Policy defines

"suit" to mean "a civil proceeding for monetary, non-monetary or injunctive relief that is

commenced by service of a complaint or similar pleading. Suit shall also include a binding

arbitration proceeding in which damages are alleged and to which you must submit or do submit

with our prior written consent."  (*Id.*)

An "Internet Media Amendatory Endorsement" to the AISLIC Policy defines "Internet media," "content," "Internet site," and "Your Internet site" as follows:

> EE.   **Internet media** means:
>
> (1)   **content** on your **Internet site**; or
> (2)   **content** created by **you** that is displayed on an **Internet site**.
>
> . . . .
>
> MEDIA (a)   **Content** means written, printed, video, electronic, digital, or digitized material, including **advertising**, images, music, descriptions, and information.
>
> . . . .
>
> MEDIA (b)   **Internet site** means a collection of web pages that are organized and linked together and enable a computer or computer technology user to retrieve material stored on one or more servers.
>
> MEDIA (c)   **Your Internet site** means an Internet site designated by a domain name owned or licensed by you.

(ECF No. 71-8, PageID.3064.) "Advertising" means "material on the **Internet** in any publicity or promotion, including branding, co-branding, co-branding, sponsorships or endorsements, on your own behalf or for others." (ECF No. 71-7, PageID.3010.)

## 2.   Ruling on Trigger

The AISLIC Policy provides that a "suit brought against you for covered wrongful acts" triggers the duty to defend. There is no formal duty to defend under the Policy before the filing of a "suit."[5] The Policy defines "suit" as "a civil proceeding for monetary, non-monetary or injunctive relief that is commenced by service of a complaint or similar pleading." Amway contends that the 2012 Letter constitutes a "similar pleading" within the AISLIC Policy's definition of a suit because it is a necessary pre-requisite to the filing of a formal lawsuit under the special procedures the parties negotiated in the 1998 Settlement Agreement. The Court is not persuaded. The Policy

---

[5] The obligation to pay "damages resulting from any claims" is part of the coverage indemnity obligation, not part of the separate duty to defend.

13

defines a "suit" as distinct from and narrower than a "claim." On its face, the definition of "suit" contemplates a formal proceeding, such as a lawsuit or binding arbitration, and requiring a complaint or pleading as an initiating document. The 2012 Letter does not amount to that kind of formal document. Indeed, if it were enough to trigger the duty to defend, commercial parties could use specially crafted ADR proceedings to expand the policy's definition of the duty to defend. The 2012 Letter fits more naturally within the Policy's definition of "claim": "a written or oral demand for money, services, non-monetary relief or injunctive relief."

Applying the policy language, the 2012 Letter amounts to a claim, not a suit, and did not by itself trigger a duty to defend under the Policy. The Counter-claim the Record Companies filed in March 2015 in the Florida Litigation falls within the Policy's definition of "suit" and triggered the duty to defend. A counter-claim is precisely the kind of "similar pleading" the Policy definition contemplates. Whether there is a basis for policyholder recovery of any expenses incurred defending the claim as it was evolving into a suit is not being decided as a matter of law at this time.[6] Neither is the AISLIC argument that Amway forfeited potential coverage by failing to tender the 2015 Counter-claim being addressed as a matter of law at this time.

### NATIONAL UNION POLICY

Amway also sought coverage under the National Union Policy, an "Umbrella Prime – Commercial Umbrella Liability Policy" in effect from April 1, 2006 to April 1, 2007. Coverage under the National Union Policy becomes available only after exhaustion of Retained Limits of approximately $2,000,000.[7]

---

[6] Potential issues include, without limitation, (1) whether AISLIC waived any argument that the 2012 Letter did not trigger a duty to defend because it failed to preserve the defense in its coverage denials; and (2) the meaning and application of the insurance company option as part of the duty to defend to pay claim expenses for claims that are not suits.

[7] Coverage under the National Union Policy also becomes available only after exhaustion of coverage under a commercial general liability policy issued by ACE American Insurance Company. ACE American is not a party in the case, and the ACE American Policy is not at issue.

The National Union Policy provides:

Coverage B Personal and Advertising Injury Liability

1.    Insuring Agreement

a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies.
. . . .

Section V – Definitions

1.    "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters.  For the purposes of this definition:
      a.    Notices that are published include material placed on the Internet or similar electronic means of communication; and
      b.    Regarding web-sites, only that part of a web-site that is about your goods, products, or services for the purposes of attracting customers or supporters is considered an advertisement.
. . . .

14.    "Personal and advertising injury" means injury, including consequential 'bodily injury,' arising out of one or more of the following offenses:
. . . infringing upon another's copyright, trade dress, or slogan in your 'advertisement.'
. . . .

21.    "Your product":
a.    Means:
(1)    Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:
      (a)    You;
      (b)    Others trading under your name; or
      (c)    A person or organization whose business or assets you have acquired.

"Occurrence" means:

As respects Personal Injury and Advertising Injury, an offense arising out of your business that causes Personal Injury and Advertising Injury.  All

>       damages that arise from the same, related or repeated injurious material or
>       act will be deemed to rise out of one Occurrence, regardless of the frequency
>       or repetition thereof, the number and kind of media used and the number of
>       claimants.

(ECF No. 67-4, PageID.2275.)

National Union argues first that the Personal Injury and Advertising Injury coverage does not apply to any of the infringements that IBOs or BSM suppliers committed, because only Amway entities are Named Insureds under the National Union Policy, and coverage extends only to advertisements of a Named Insured. This argument fails under the plain language of the Policy. The Policy's broad definition of "advertisement" plainly extends beyond Amway's own direct communications. It encompasses communications by others to the general public or specific market segments about "[Amway's] goods, products, or services for the purpose of attracting customers or supporters." The IBO and BSM supplier communications certainly could satisfy this standard in the eyes of a reasonable factfinder.

The parties also dispute whether the National Union Policy in effect from April 2006 to April 2007 obligates National Union to provide coverage for all the infringements alleged in the Internet Video Claim, which span a longer period: namely, 2006-2015. Amway argues that all the infringements the Internet Video Claim alleges amount to a single "Occurrence." National Union contends that each alleged infringement falls only within the coverage year in which it occurred. National Union also argues that Michigan law requires allocation of a claim that spans a series of policy periods regardless of the number of occurrences. Under Amway's approach, National Union would have to provide coverage over and above the 2006-2007 Retained Limit for the totality of the Internet Video Claim. Under National Union's approach, none of the claims would reach the Retained Limit for any policy year, and National Union would not have to pay anything.

Neither side is entitled to judgment as a matter of law. Amway contends that it is "beyond dispute" that all the infringements alleged in the Internet Video Claim amount to a single Occurrence under the policy. The Court disagrees. The more than 1,000 alleged infringements took place over a period of more than ten years and involved more than 300 uploads by multiple different parties. Whether all these alleged infringements, or clusters of the alleged infringements, "arise from the same, related or repeated injurious material or act" is in genuine dispute and requires factual determinations, precluding judgment as a matter of law. Similarly, to the extent Amway asserts that National Union has waived defenses by failing to raise or reserve specific rights, the argument requires factual development and cannot be decided as a matter of law.

National Union relies on a series of Michigan cases for its theory that the settlement monies must be allocated to each of the policy periods based on the injury or damage occurring within that period. According to National Union, these cases mean that Amway's position fails as a matter of law. The Court disagrees. The cases depend on the unique fact patterns at issue, just as this case will. For example, in *Arco*, the Michigan Court of Appeals considered how to allocate coverage risk for environmental damage in cases "involving continuous property damage and successive periods of liability coverage." *Arco Industries Corp. v. American Motorists Ins. Co.*, 232 Mich. App. 146, 162, 594 N.W.2d 61 (1998). Similarly, *Wolverine World Wide* involves allocation of liability for environmental contamination occurring over years. *Wolverine World Wide, Inc. v. Liberty Mut. Ins. Co.*, No. 260330, 2007 WL 705981 (March 8, 2007). In these environmental cases, the initial deposit of contaminants may have occurred years earlier, but continuous migration of the contaminants through soil and groundwater may create new and ongoing instances of property damage, as defined in the policies. The decisions rested on particular policy language in CGL coverage applied to the particular fact pattern of environmental contamination. It did not

establish an iron rule of law for all policies and all fact patterns. This is also true of the other cases National Union cites. *See Continental Casualty Co. v. Indian Head Industries, Inc.*, 666 F.App'x 456 (2016) (allocating coverage risk for exposure to asbestos-containing products); *Decker Manufacturing Corp. v. The Travelers Indemnity Co.*, No. 1:13-cv-820, 2015 WL 438229 (W.D. Mich. Feb. 3, 2015) (allocating coverage risk for environmental contamination); *City of Sterling Heights v. United Nat. Ins. Co.*, No. 03-72773, 2007 WL 172529 (E.D. Mich. January 19, 2007) (allocating coverage risk where "there is no feasible way to separate the various covered and uncovered causes of the … economic damages…."); *Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* No. 4:01-cv-157, 2005 WL 1610663 (W.D. Mich. July 1, 2005) (allocating coverage risk for "continuous [bodily] injury"); *Century Indem. Co. v. Aero-Motive Co.*, 318 F.Supp.2d 530 (W.D. Mich. 2003) (allocating coverage risk for environmental damage). The application of all relevant policy language to the fully developed fact pattern will have to await the factual development of plenary discovery. It cannot be resolved as a matter of law on the present record.

## CONCLUSION

Based on the parties' input, the Court originally bifurcated this case into two phases.  The first phase addressed a series of coverage issues under the First Case Management Order, and culminated in a series of dispositive motions (ECF Nos. 64, 66, 70 and 71).  Based on this Opinion, the Court has resolved the coverage issues that it believes can be decided now as a matter of law. In particular, the Court has concluded:

1.      Exclusions J and P of the AISLIC Policy do not as a matter of law preclude all coverage for the Internet Video Claim(s);

2.      The 2015 Counter-claim, and not the 2012 Letter, is the trigger of AISLIC's duty to defend under the AISLIC Policy;

3.     The National Union Policy does not as a matter of law preclude coverage for advertisements posted by IBOs, or other third parties, rather than by Amway itself; and

4.     The National Union Policy does not as a matter of law require pro rata apportionment of Amway's claimed recovery over all National Union policies on the risk.

A number of issues remain open around each of these conclusions, as noted in the Opinion.

Those issues can be resolved in the next phase of the litigation.  The Court will convene a Status

Conference to develop the Second Case Management Order with the parties.

**IT IS SO ORDERED.**

Dated:   March 22, 2019            /s/ Robert J. Jonker
                                   ROBERT J. JONKER
                                   CHIEF UNITED STATES DISTRICT JUDGE