UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALTICOR GLOBAL HOLDINGS, INC.,
AMWAY CORP., ALTICOR, INC., and
AMWAY INTERNATIONAL, INC.,

       Plaintiffs/Counter-Defendants,

                                       CASE NO. 1:17-CV-388

v.

                                       HON. ROBERT J. JONKER

AMERICAN INTERNATIONAL
SPECIALTY LINES INSURANCE
COMPANY (n/k/a AIG Specialty
Insurance Company),

       Defendants, and

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.,

       Defendant/Counter-Plaintiff.

_____/

## OPINION AND ORDER

      This insurance coverage dispute is before the Court on Phase Two motions for summary

judgment or partial summary judgment. Plaintiffs Alticor Global Holdings, Inc., Amway Corp.,

Alticor, Inc., and Amway International (collectively, "Amway")[1] contend that Defendants

American Lines Insurance Company ("AISLIC") and National Union Fire Insurance Company of

Pittsburgh, PA ("National Union") breached insurance agreements with Amway by denying

coverage to which Amway was entitled under the relevant policies and refusing to provide a

defense or to reimburse defense and claim expenses in a lawsuit that ultimately settled. The

---

[1] Plaintiff Alticor Global Holdings, Inc. is a holding company, and Plaintiffs Amway Corp., Alticor Inc., and Amway
International are among its subsidiaries. For ease of reference, this Opinion refers to all four plaintiffs, individually
and collectively, as "Amway."

motions now before the Court build upon the Court's rulings on the parties' Phase One motions for summary judgment or partial summary judgment (ECF No. 110).

## BACKGROUND

### A.    The 1996 Litigation and 1998 Settlement

The precursor to this case is copyright litigation dating back to 1996 (the "1996 Litigation").[2] The 1996 Litigation transpired after a group of entertainment companies (the "Record Companies") sued Amway and approximately fifty Amway Independent Business Owners ("IBOs") in the U.S. District Court for the Middle District of Florida for copyright infringement. The parties to the 1996 Litigation eventually settled the dispute under a Settlement and Release Agreement (the "1998 Settlement"). The 1998 Settlement resolved claims for past infringement but did not release Amway or IBOs from potential claims of infringement arising in the future. The 1998 Settlement established a framework for addressing potential future claims, and the U.S. District Court for the Middle District of Florida retained jurisdiction to enforce the 1998 Settlement.

### B.    The 2012 Letter and Internet Video Claim

Fourteen years later, in November 2012, the Record Companies sent Amway a letter accusing it of infringing hundreds of copyrighted sound recordings (the "2012 Letter").[3] In 2013, the Record companies expanded the allegations, ultimately accusing Amway of direct, contributory, or vicarious liability for the infringement of hundreds of sound recordings used in over 1,000 different videos uploaded to Internet sites (the "Internet Video Claim"). The 2012 Letter explicitly invokes the framework for dispute resolution provided in the 1998 Settlement:

---

[2] A detailed description of the 1996 Litigation and ensuing settlement appears in the Court's earlier Opinion, ECF No. 110, at PageID.6497-98.
[3] A detailed description of the 2012 Letter and the Internet Video Claim likewise appears in the Court's earlier Opinion, ECF No. 110, at PageID.6498-99.

> This letter constitutes notice pursuant to Paragraph 13.2 of the Settlement and Release Agreement that [the Record Companies] reasonably believe that activities or conduct on the part of Amway Corporation and distributors of Amway products, as well as various individuals and entities associated with them, infringe copyrights and other rights in sound recordings owned or controlled by one or more of [the Record Companies].

(ECF No. 71-9, PageID.3085) (bold and italics omitted).

## C.    Amway's Coverage Requests

Amway tendered the 2012 Letter to AISLIC on May 21, 2013. Amway sought coverage from AISLIC under a policy entitled "AIG net Advantage Security – Internet & Network Security Insurance" (the AISLIC Policy"). AISLIC denied coverage in July 2013 under a series of such policies.[4] AISLIC detailed multiple reasons for denying coverage, including, without limitation, that (1) coverage does not extend to infringements on websites other than those of Amway and its distributors or licensees; (2) Exclusion J bars coverage for claims, wrongful acts, or loss arising out of the 1996 Litigation; and (3) Exclusion P bars coverage for claims arising out of any circumstance or occurrence if claims could have been reported under a preceding policy. (ECF No. 71-14.) AISLIC reaffirmed the denial of coverage twice more, each time for the same reasons the initial denial provided. (ECF No. 71-15, 16.) AISLIC did not state in any of the notices that it was denying coverage or a defense because the 2012 Letter was not a "suit" that triggered coverage.

Amway sought coverage from National Union for the Internet Video Claim under umbrella policies encompassing policy years 2005-2011. National Union responded with correspondence reserving its rights to deny coverage for multiple reasons under the umbrella policies; identifying coverage exclusions; and requesting more information. Throughout the dispute over the Internet Video Claim, National Union maintained its reservation of rights position without either denying

---

[4] In this lawsuit, Amway contends that it is entitled to coverage under the AISLIC Policy with effective dates from July 1, 2006 – July 1, 2007, extended by endorsement to July 20, 2007, Policy No. 672-91-00.

3

or agreeing to provide coverage. National Union now takes the position that Amway is not entitled to coverage for the Internet Video Claim.

### D.    Florida Litigation

In April 2014, Amway filed suit against the Record Companies in the United States District Court for the Middle District of Florida, alleging breach of the 1998 Settlement. The following March, the Record Companies filed counter-claims for breach of contract and direct, contributory, and vicarious copyright infringement (the "2015 Counter-claim" or "Counter-claim"). The Record Companies alleged that Amway or its affiliates uploaded to the Internet 1,392 infringing videos from 2006 to 2016. The parties ultimately settled the Florida Litigation, and the case was dismissed with prejudice in January 2017. According to the settlement, Amway paid $7,562,500 to the Record Companies to resolve the Internet Video Claim. Amway incurred $6,653,705.79 in defense costs from November 27, 2012, the date the Record Companies first gave notice, to March 6, 2015, the date the Record Companies filed their counter-claims. Since the filing of the counter-claims, Amway incurred an additional $16,513,882.41 in defense costs. Neither AISLIC nor National Union provided any defense or indemnity for Amway regarding the Internet Video Claim.

### E.    AISLIC Policy

Amway seeks reimbursement of its defense and indemnity costs under AISLIC's July 2006–July 2007 Policy. Amway purchased annual AISLIC Policies from 2006 to 2016. The AISLIC Policy limits coverage to $25,000,000, inclusive of defense costs, with a $500,000 per claim retention and $750,078 in initial annual premium. The Policy provides "Internet & Network Security Insurance," which includes coverage for "Internet Media Liability." (ECF No. 235-5, PageID.11301.) Under the heading "Internet Media Liability Coverage," the Policy states:

> **We** shall pay on **your** behalf those amounts, in excess of the applicable **Retention**, you are legally obligated to pay, including liability **assumed**

> **under contract**, as **damages**, resulting from any **claim(s)** made against **you** for **your wrongful act(s)** in the display of **Internet media**.  Such **wrongful act(s)** must occur during the **policy period**.

(*Id.*, PageID.11304.) Under "Defense Costs, Charges and Expenses," the AISLIC Policy

provides:

> **We** have the right and duty to defend a **suit** brought against you for covered **wrongful acts**, even if the **suit** is groundless or fraudulent and, with **your** written consent, settle any suit if **we** believe that it is proper.
> ….
> **We** shall pay **claim expenses** you incur with **our** prior written consent in the defense of a suit for covered wrongful acts.  In addition, **we** may, but are not obligated to, pay **claim expenses** with respect to a claim that is not a suit….

(*Id.*, PageID.11364-5.) The AISLIC Policy defines "you," "your," or "insured" as follows:

> CCC.   **You**, **your** or **insured** means:
>
> (1) the **named Insured**;
>
> (2) any **subsidiary** of **the named insured**, but only with **respect to wrongful acts, extortion claims, failures of security, criminal reward funds, crisis events** or **loss** that occur while it is a subsidiary and is otherwise covered by this policy;
>
> (3) any past, present or future employee of the **named insured** or **subsidiary** thereof, but only while acting within the scope of their duties as such;
>
> (4) with respect to coverage A, any agent or independent contractor, including distributors, licensees and sub-licensees, in their provision of material for **Internet media** on behalf or at the direction of the **named insured**, but only in the event that a **claim** has also been brought against an **insured** as defined in subparagraphs (1) through (3) above, and only while such **claim** is pending against such **insured**;
>
> (5) any **leased worker**; and
>
> (6) any entity scheduled by written endorsement to this policy whom the **named insured** is required by contract to add as an insured under this policy, but only for the **wrongful acts** of the **named insured**.
>
> ….

5

(7) any past, present or future officer, director or trustee of the **named insured** or **subsidiary**, but only while acting within the scope of their duties as such, and in furtherance of or on behalf of the legal interests of the **named insured**.

(*Id.*, PageID.11373-74, 11390.) The Policy also defines "Internet media, "content," "Internet site," and "Your Internet site" as follows:

> EE.   **Internet media** means:
>
> (1)   **content** on your **Internet site**; or
> (2)   **content** created by **you** that is displayed on an **Internet site**.
> . . . .
> MEDIA (a)   **Content** means written, printed, video, electronic, digital, or digitized material, including **advertising**, images, music, descriptions, and information.
> . . . .
> MEDIA (b)   **Internet site** means a collection of web pages that are organized and linked together and enable a computer or computer technology user to retrieve material stored on one or more servers.
>
> MEDIA (c)   **Your Internet site** means an Internet site designated by a domain name owned or licensed by you.

(*Id.*, PageID.11418.) Though the Policy does not cover any claim arising from any copyright infringement under MEDIA (a), this exclusion "does not apply to infringement of Internet media."

(*Id.*, PageID.11419.)

Under "Other Insurance," the AISLIC Policy provides:

> **F. Other Insurance**
>
> Except as otherwise stated to the contrary elsewhere in the policy, such insurance as is provided by this policy shall be excess of any other valid and collectible insurance available to you.

(*Id.*, PageID.11382.) Thus, the AISLIC Policy is to be collected after other valid and collectible insurance is exhausted.

The AISLIC Policy also provides a "deemer" clause:

> All **claims** arising from the same **wrongful act**(s) or series of continuous, repeated or related **wrongful acts** shall be treated as one **claim**. With respect to coverage A, the policy limit of liability and applicable sublimits of liability and AIG **netAdvantage Security** policy issued by **us** to the **named insured** in effect when the first such **wrongful act** took place after the first inception date, shall be the only policy limit of liability, applicable sublimit of liability, and policy that shall apply.

(*Id.*, PageID.11377.) This language telescopes all related claims into a single point of coverage, thereby triggering only one AISLIC Policy for all related underlying claims. Here, the infringing videos are "related wrongful acts [that] shall be treated as one claim." Thus, only one AISLIC Policy is triggered. The Parties do not dispute this conclusion and agree that the 2006-2007 AISLIC Policy is triggered. Instead, the parties dispute whether the "other insurance" provision in the AISLIC Policy requires Amway to exhaust potential coverage on a series of commercial general liability policies issued by ACE before reaching AISLIC.

## F.      ACE Policies

From April 1, 2005 to May 15, 2016, Amway also purchased eleven annual commercial general liability policies from ACE. The ACE Policies provide coverage for "personal and advertising injury," which includes "[i]nfringing upon another's copyright, trade dress or slogan in your 'advertisement.'" (ECF No. 235-1, PageID.10939, 10948.) The Policies apply to an "offense arising out of your business but only if the offense was committed in the 'coverage territory' during the policy period." (*Id.*, PageID.10940.) Each policy provides a $2,000,000 indemnity limit per occurrence or offense and a $4,000,000 aggregate limit, and in exchange, Amway pays a premium of $51,000. In reality, the ACE Policies are simply "fronting" policies because Amway is obligated to reimburse ACE for all losses incurred under the policies.[5] The

---

[5] Under a fronting policy, "the business pays a greatly discounted premium to an insurance company with insurance licensing and filing capabilities in particular states in exchange for an insurance policy that complies with the financial-responsibility laws of each state in which the business is required to maintain proof of financial responsibility." *White v. Ins. Co. of State of Pa.*, 405 F.3d 455, 457 (6th Cir. 2005) (internal quotation omitted). Essentially, "the business is

ACE Policies accomplish the "fronting" arrangement through a series of policy provisions and endorsements, the details of which changed over time. *See* (ECF No. 235-2, PageID.11075, 1113) (for 2007-2009 policies); (ECF No. 235-3, PageID.11173-11174) (for remaining ACE policies). In addition, ACE and Amway entered into a separate collateral agreement, requiring Amway to post an irrevocable letter of credit to guarantee ACE's ability to recover any defense or settlement costs it paid. (ECF No. 234-24.)

The parties agree that ACE coverage is triggered, (ECF No. 231, PageID.8472), but dispute whether ACE is valid and collectible "Other Insurance" under the AISLIC Policy and whether one or all ACE Policies are triggered.

### G.    National Union Policy

Amway also seeks coverage under the National Union Policy, an "Umbrella Prime – Commercial Umbrella Liability Policy" in effect from April 1, 2006 to April 1, 2007. The National Union Umbrella Policy contains a $50,000,000 limit and a $10,000 "Self-Insured Retention" that apply to "Each Occurrence." Coverage under the National Union Policy becomes available only after exhaustion of the Retained Limits of approximately $2,000,000.

The National Union Policy provides:

> Coverage B Personal and Advertising Injury Liability
>
> I.    Insuring Agreement
>
> a.    We will pay on behalf of the Insured those sums in excess of the Retained Limit that the insured becomes legally obligated to pay as damages by reason of liability imposed by law because of . . . **Personal Injury and Advertising Injury** to which this insurance applies . . .

---

renting an insurance company's licensing and filing capabilities, which is often economically advantageous for the business. *Id.* "In typical fronting policies, the deductible matches the limit of liability, such that the business bears the entire risk of loss." *Id.*

(ECF No. 233-10, PageID.9754.) The National Union Policy also states:

    VII.  Definitions

    A.   **Advertisement** means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters.  For the purposes of this definition:

        1.  Notices that are published include material placed on the Internet or similar electronic means of communication; and

        2. Regarding web-sites, only that part of a web-site that is about your goods, products, or services for the purposes of attracting customers or supporters is considered an advertisement.

. . . .

    U.   **Personal Injury and Advertising Injury** means injury arising out of your business, including consequential **Bodily Injury**, arising out of one or more of the following offenses:  . . . infringing upon another's copyright, trade dress, or slogan in your **Advertisement.**

. . . .

    DD.   **Your Product** means:

        1. any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

            a.     you;
            b.     others trading under your name; or
            c.     a person or organization whose business or assets you have acquired.

(*Id.*, PageID.9769, 9774-75.)

The National Union Umbrella Policies only apply in excess of each Policy's "Retained Limit," which is defined as:

    1.  the total applicable limits of **Scheduled Underlying Insurance** and any applicable Other Insurance providing coverage to the **Insured**; or

    2.  the **Self-Insured Retention** applicable to each **Occurrence** that results in damages not covered by **Scheduled Underlying**

> **Insurance** nor any applicable **Other Insurance** providing coverage
> to the Insured.

(*Id.*, PageID.9757, 9775.) The 2006-2007 ACE Policy is listed as the insurer in the "Schedule of

Underlying Insurance" for "General Liability." (*Id.*, PageID.9777.) AISLIC is not listed as

"Scheduled Underlying Insurance."

### G.    Current Dispute

This lawsuit arises out of AISLIC's and National Union's denial of coverage in connection

with the Internet Video Claim. In Phase One of this case, the Court addressed a limited range of

issues framed by the parties' motions and made several rulings as a matter of law. In particular,

the Court determined that:

1.     Exclusions J and P of the AISLIC Policy do not as a matter of law preclude all
coverage for the Internet Video Claim(s);

2.     The 2015 Counter-claim, and not the 2012 Letter, is the trigger of AISLIC's duty
to defend under the AISLIC Policy;

3.     The National Union Policy does not as a matter of law preclude coverage for
advertisements posted by IBOs, or other third parties, rather than by Amway itself; and

4.     The National Union Policy does not as a matter of law require pro rata
apportionment of Amway's claimed recovery over all National Union Policies on the risk.

Before the Court are parties' Phase Two cross motions for summary judgment or partial

summary judgment on several remaining coverage and related damages issues.

### LEGAL STANDARDS

Summary judgment is proper where the evidence presents no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a).

A fact is material if it is so defined by substantive law and will affect the outcome of the suit under

the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute

exists if the court finds that a reasonable jury could find in favor of the non-moving party. *Id.*

Summary judgment is required where "after adequate time for discovery and upon motion . . . a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding a motion for summary judgment, the court draws all inferences in the light most favorable to the non-moving party. *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992).

Michigan substantive law applies in this case. Michigan courts "construe an insurance policy in the same manner as any other species of contract, giving its terms their ordinary and plain meaning if such would be apparent to a reader of the instrument." *DeFrain v. State Farm Mut. Auto. Ins. Co.*, 491 Mich. 359, 367, 817 N.W. 2d 504 (2012) (internal quotation marks omitted). Courts "must look at the contract as a whole and give meaning to all terms." *Auto-Owners Ins. Co. v. Churchman*, 440 Mich. 560, 566, 489 N.W.2d 431 (1992). Michigan courts "interpret[] the words used in a contract in accordance with their commonly used meanings." *Citizens Ins. Co. v. Pro-Seal Service Group, Inc.*, 477 Mich. 75, 84, 730 N.W. 2d 682 (2007) (internal quotation omitted). "After ascertaining the meaning of a contract's terms, 'a court must construe and apply unambiguous contract provisions as written.'" *Auto Owners Ins. Co. v. Seils*, 310 Mich. App. 132, 145, 871 N.W. 2d 530 (2015) (quoting *Rory v. Continental Ins. Co.*, 473 Mich. 457, 461, 464, 703 N.W. 2d 23 (2005). Ambiguity exists if, after considering the whole contract, one fair reading leads to the understanding that coverage applies under certain circumstances and another fair reading leads to the conclusion that coverage does not apply under the same circumstances. *Id.* at 146. Michigan courts construe an ambiguous provision in an insurance contract against the insurer and in favor of coverage. *Id.*

## AISLIC AND ACE POLICY ISSUES

### A.  Triggering of AISLIC Policy

1.  *Duty to Defend Is Triggered*

As the Court found in its Phase One Opinion, AISLIC's duty to defend was triggered by the Record Companies' 2015 counter-claim. Under the AISLIC Policy, it must defend a "suit brought against [Amway] for covered wrongful acts[.]" Wrongful acts includes "an infringement of copyright." The Record Companies claimed that Amway infringed their copyrights by directly, contributorily, and vicariously creating infringing videos and uploading them onto the Internet. Based on the plain meaning of AISLIC's terms, the Record Companies' allegations were covered wrongful acts. Accordingly, AISLIC's duty to defend is triggered.

2.  *Duty to Indemnify Is Triggered*

Under the AISLIC Policy, it is obligated to pay "damages resulting from any claim(s) made against you for your wrongful act(s) in the display of Internet media." "Claim" includes "a written or oral demand for money, services, non-monetary relief or injunctive relief" and "a suit." Here, the $7,562,500 in settlement costs are damages resulting from the Record Companies' counter-claim against Amway. The counter-claim is a "suit," as contemplated by the AISLIC Policy, and it is was made against Amway for its alleged infringing Internet videos. Thus, AISLIC's duty to indemnify is triggered.

### B.  AISLIC's "Deemer" Clause

The AISLIC Policy also provides that "[a]ll claims arising from the wrongful act(s) or series of continuous, repeated or related wrongful acts shall be treated as one claim." The related claims are telescoped into the first triggered policy.

The Internet Video Claim telescopes to the 2006-2007 AISLIC Policy. The Record Companies alleged in their Internet Video Claim that Amway and its IBOs uploaded 1,392 infringing videos onto the Internet. The Claim arose from the repeated and related acts of creating and uploading infringing videos onto the Internet. Though the individual infringements occurred from 2006 to 2016, the Internet Video Claim is treated as one claim and telescopes to the first AISLIC Policy.  The first AISLIC Policy was from July 2006 to July 2007. Thus, only the 2006-2007 AISLIC Policy is triggered, and it is liable for defense, indemnity, and settlement costs up to its applicable limit of $25,000,000.

### C.  Application of the ACE Policies

1.     *ACE Is Fronting Insurance*

The parties agree that the ACE Policies are fronting insurance. An insurance company issues a fronting "insurance policy—on behalf of a self-insured organization . . . without the intention of bearing any of the risk. The risk of loss is transferred back to the self-insured." *Corwin v. DaimlerChrysler Ins. Co.*, 819 N.W.2d 68, 72 n.3 (Mich. Ct. App. 2012); *see also White v. Ins. Co. of State of Pa.*, 405 F.3d 455, 457 (6th Cir. 2005) ("In typical fronting policies, the deductible matches the limit of liability, such that the business bears the entire risk of loss."). Since under a fronting policy, "the deductible and the coverage are equal," "there is no real coverage under the policy." *Hertz Corp. v. Stachowiak*, No. 254741, 2006 WL 1752292, at *3 (Mich. Ct. App. June 27, 2006).

Under the April 2005 to May 2009 ACE Policies, ACE has no duty to defend any suit. Amway is required to pay a $2,000,000 deductible per occurrence, equaling the amount of coverage. ACE retains a right at its sole discretion to pay for any damages, settlement, and "allocated loss adjustment expense," but Amway is to promptly reimburse ACE. Under the May

2009 to May 2016 ACE Policies, though ACE has a duty to defend Amway against personal and advertising injury suits, Amway must reimburse ACE, and the deductible matches the coverage limits. Effectively, no risk is transferred to ACE under any of its Policies, and Amway bears all responsibility for defense and indemnity costs. Accordingly, the ACE Policies provide fronting insurance.

The parties dispute whether the ACE Policies, as fronting coverage, amount to "Other Insurance" that must be exhausted first before AISLIC is required to reimburse Amway. AISLIC says the ACE Policies are still insurance within the meaning of its "Other Insurance" policy language, but Amway says that fronting coverage is not "other valid and collectible insurance available to [Amway]" that falls within the AISLIC provision. The Court turns to the issue now.

2. *ACE Is Not "Other Insurance" Under the AISLIC Policy*

Under AISLIC's "Other Insurance" term, it is only responsible for reimbursing Amway if there is no other "valid and collectible insurance available to [Amway]." AISLIC argues that ACE is "Other Insurance." It contends that the nature and terms of the ACE Policies mimic real insurance policies, and ACE must pay sums owed under its Policies regardless of whether Amway reimburses ACE. The Court is not persuaded by AISLIC's argument.

When interpreting the "Other Insurance" provision, the Court must apply contract analysis principles and adhere to the plain meaning of the provision. *DeFrain*, 491 Mich. at 367.[6] The most natural reading of AISLIC's "Other Insurance" provision is that the ACE fronting Policies are not "valid and collectible insurance available to" Amway. The plain meaning of "collectible" is that

---

[6] This is not the only general rule for construction of insurance policies in Michigan. It is also an approach Michigan courts have used in wrestling specifically with potentially conflicting "other insurance" provisions when coverage under multiple policies is at issue. Rather than simply adopt a categorical rule that ignores the actual language at issue, the Michigan court emphasized the need to look at the actual language and to make a genuine effort to understand what the parties intended. *See, e.g., St. Paul Fire & Marine Ins. Co. v. Am. Home Assur. Co.*, 197 Mich. App. 521, 524-26, 495 N.W.2d 814, 816-17 (1992), aff'd, 444 Mich. 560, 514 N.W.2d 113 (1994).

the insurance is able or required to reimburse the insured for covered losses. "Available" has been construed under Michigan law "to mean that which is 'actually' or 'reasonably' available to the insured . . . as opposed to that which is theoretically or hypothetically available." *Auto-Owners Ins. Co. v. Leefers*, 203 Mich. App. 5, 11–12, 512 N.W.2d 324, 326–27 (1993). The ACE Policies are not "collectible" nor "available" to Amway because ultimately Amway bears responsibility for all the costs under the ACE Policies. The Policies are only "theoretically or hypothetically available" since they allow Amway to essentially "rent[] an insurance company's licensing and filing capabilities." *White*, 405 F.3d at 457. Furthermore, the deductible matches the coverage limit, and Amway must either reimburse ACE for any money spent under the Policies or ACE assumes no responsibility to pay defense or indemnity costs.

Other courts have held that fronting insurance cannot be "other insurance." *See, e.g., Scottsdale Ins. Co. v. United Rentals (N. Am.), Inc.*, 977 F.3d 69, 75 (1st Cir. 2020); *Hewlett-Packard Co. v. Cigna Prop. & Cas. Ins. Co.*, No. CIV. 99-20207 SW, 2000 WL 255990, at *8 (N.D. Cal. Jan. 5, 2000) ("A fronting policy does not indemnify the insured but is issued to satisfy financial responsibility laws of various states by guaranteeing to third persons who are injured that their claims will be paid," so it is not "other insurance."). Though an insurer may have some responsibility under a fronting policy, it is not "valid and collectible insurance." *Scottsdale Ins. Co.*, 977 F.3d at 75. In *Scottsdale*, the insured purchased a fronting policy from ACE and was obligated to pay ACE back for any money spent under the policy. *Id.* at 71, 75. Even though ACE had a responsibility under the policy to pay damages if the insured cannot pay the deductible, the insured had to reimburse ACE. *Id.* at 75. The ACE policy was not "valid and collectible insurance" to be "other insurance." *Id.* Similarly, here, the ACE Policies are not "valid and collectible insurance available to Amway" because they are fronting policies.

AISLIC relies on a series of Michigan cases that implicate the Michigan No-Fault Act, but these cases do not apply. No-fault insurance is not a reliable guide for interpreting and applying the ACE and AISLIC Policies. Under Michigan law, "the aim of the no-fault act was to make minimum insurance mandatory." *Smith v. Physicians Health Plan, Inc.*, 444 Mich. 743, 751, 514 N.W.2d 150, 154 (1994). Furthermore, "[t]he purpose of Michigan's no-fault insurance system is to provide victims of automobile-related accidents with assured, adequate, and prompt payment for economic losses." *Cruz v. State Farm Mut. Auto. Ins. Co.*, 241 Mich. App. 159, 164, 614 N.W.2d 689, 693 (2000), aff'd, 466 Mich. 588, 648 N.W.2d 591 (2002). Michigan implements these public policies with statutory mandates, and because insurance benefits are mandated by the No-Fault Act, "the statute is the 'rule-book' for deciding the issues involved in questions regarding awarding those benefits." *Id.* Michigan courts treat no-fault cases as a special and unique category of risk management that cannot be automatically extended to insurance more generally. *Cf. Fed. Kemper Ins. Co. v. Health Ins. Admin., Inc.*, 424 Mich. 537, 543 n.5, 383 N.W.2d 590, 592 n.5 (1986) (distinguishing no-fault cases from other kinds of insurances cases), overruled in part on other grounds*, Auto Club Ins. Ass'n v. Frederick & Herrud, Inc.*, 443 Mich. 358, 505 N.W.2d 820 (1993). Here, the AISLIC and ACE Policies are not mandated policies for the purpose of protecting potential accident victims in a no-fault world. Instead, the Policies are commercial insurance contracts designed to cover business risks. Thus, the No-Fault Act cases have no bearing here.

AISLIC specifically cites *Allstate Insurance Co. v. Elassal*, 203 Mich. App. 548, 554-56, 512 N.W.2d 856, 858-59 (1994), in which the court concludes that "under [the Michigan No Fault Act and the Financial Responsibility Act], self-insurance, as certified by the Secretary of State, is the functional equivalent of a commercial insurance policy," so it is "other collectible insurance" under Allstate's insurance policy. The court's holding rests on the statutory terms of the No-Fault

16

Act. Here, the ACE Policies are not a form of self-insurance under the Michigan No Fault Act nor the Financial Responsibility Act, so the court's holding does not apply. AISLIC also cites *Jarrad v. Integon National Insurance Co.*, 472 Mich. 207, 209, 696 N.W.2d 621, 622 (2005), which holds that "a self-funded long-term disability plan constitutes 'other health and accident coverage' that is subject to coordination under" the No Fault Act. Again, this holding does not apply to the ACE Policies.

Lastly, construing the AISLIC Policy's "Other Insurance" language to reach only other policies that will actually reimburse a policyholder for real losses and not to reach mere fronting policies, like the ACE ones at issue here, is consistent with ordinary commercial expectations. The ACE Policies were not designed or priced to cover real losses; they simply provided a vehicle for certain financial responsibility insurance requirements. In the words of the Sixth Circuit, they allowed Amway to "rent[] [ACE's] licensing and filing capabilities." *White*, 405 F.3d at 457. In contrast, the AISLIC Policy was written and priced to reimburse real losses in this area of risk. Accordingly, ACE is not "Other Insurance," and AISLIC bears the responsibility for the indemnity and defense costs.[7]

**NATIONAL UNION POLICY ISSUES**

National Union contends that it is not obligated to indemnify Amway under its 2006-2007 Policy because ACE's applicable limits have not been exhausted. This, in turn, depends on

---

[7] AISLIC also argues that if ACE is "Other Insurance," then all eleven ACE Policies are triggered because the underlying copyright infringements occurred throughout ACE's coverage period. The Court need not reach this issue based on its holding that fronting policies like ACE are not "Other Insurance" within the meaning of the AISLIC Policy. But even assuming that ACE is "Other Insurance," only the one underlying ACE Policy that was in effect at the same time as the AISLIC Policy would be arguably available in the Court's view. Under Michigan law, "other insurance" provisions apply only to concurrent policies. *Alticor, Inc. v. Nat'l Union Fire Ins. Co. of Pa.*, 916 F. Supp. 2d 813, 830 (W.D. Mich. 2013) ("Extending the scope of 'other insurance' provisions to encompass successive or consecutive insurance policies is 'seriously flawed.'"). Since the Internet Video Claims telescope into the 2006-2007 AISLIC Policy, only the concurrent 2006-2007 ACE Policy could even arguably be "other insurance" under the AISLIC clause.

National Union's position that the multiple, successive ACE Policies are triggered for every time period of any alleged infringement. This may or may not be correct. The ACE Policies have some language that may treat all related claims as arising during the first time period triggered, but the language is less clear than the AISLIC telescoping provision. Amway maintains that National Union is responsible for reimbursing Amway for any portion of the Internet Video Claim that exceeds the limits of liability of the AISLIC Policy. It is not necessary to resolve these questions— or any other National Union coverage issues—because the $25,000,000 of the triggered AISLIC Policy is enough to cover the claim, as will become clear in the next section.

DAMAGES

### A.  Waiver of Effective Trigger

Amway recognizes the Court's ruling that AISLIC's duty to defend or reimburse defense costs runs from the 2015 counter-claim, not the earlier 2012 notice letter. Amway continues to disagree with the ruling but maintains AISLIC waived the argument by failing to include it in its denial letters. Thus, according to Amway, even if the Court's ruling is correct, AISLIC still loses the point by waiver. The Court disagrees.

Under Michigan law, "[g]enerally, once an insurance company has denied coverage to an insured and stated its defenses, the insurance company has waived or is estopped from raising new defenses." *Kirschner v. Process Design Assocs., Inc.*, 459 Mich. 587, 593, 592 N.W.2d 707, 709 (1999). However, the doctrine of waiver does not apply "to broaden the coverage of a policy to protect the insured against risks that were not included in the policy or that were expressly excluded from the policy." *Id.* at 709-10. The "insurance company should not be required to pay for a loss for which it has charged no premium." *Id.* at 710. The *Kirschner* court noted limited instances where waiver and estoppel may bring new risks within coverage, namely (1) the insurance

18

company misrepresented the terms of the policy to the insured, or (2) the insurance company undertook the defense of the insured without reserving the right to deny coverage. *Id.* Those do not apply here.

A holding that AISLIC waived the right to rely on its basic coverage language would allow Amway to expand AISLIC's basic coverage obligation. AISLIC's defense obligation applied only to suits, not to notice letters. By enforcing this plain language, the Court is simply giving both sides what they bargained for up front – neither more nor less. It is certainly true that a carrier can lose its ability to rely on a particular exclusion in the policy by failing to assert it in a timely and proper way. But that is not what is at issue when dealing with the basic insuring agreements of the policy. Therefore, AISLIC is only responsible for any recoverable defense costs incurred since the counter-claim was filed. Amway claims these total $16,513,882.41.

## B.  Waiver of Challenging Costs

Amway also argues that AISLIC has waived its ability to challenge the reasonableness of defense costs so that it is on the hook for the full amount. AISLIC says it still has the right to challenge the reasonableness of the defense costs.[8] The Court agrees with Amway on the waiver argument.

"If an insurer wrongfully declines to defend, the insurer is liable for the costs of defense as well as any reasonable, good faith settlement paid by the insured." *N. Bank v. Cincinnati Ins. Companies*, 125 F.3d 983, 986 (6th Cir. 1997); *see also Alticor, Inc. v. Nat'l Union Fire Ins. Co. of Pa.*, 916 F. Supp. 2d 813, 831 (W.D. Mich. 2013) ("Under Michigan law, when an insurer wrongfully declines to defend, the insurer is liable for the costs of the defense."). This Court has reached a similar result by ruling that as a consequence of an insurer's decision not to defend an

---

[8] AISLIC does not challenge the reasonableness of the settlement amount.

insured, "the settlements and defense costs for the underlying lawsuits are presumed reasonable," and the insurer has the burden of proving that the costs are unreasonable. *Stryker Corp. v. XL Ins. Am. Inc.*, No. 4:01-CV-157, 2008 WL 68958, at *4 (W.D. Mich. Jan. 4, 2008). More recently, the Sixth Circuit Court of Appeals held that actual attorneys' fees incurred by an insured in an underlying lawsuit "are a reasonable measure of damages caused by the insurer's wrongful refusal to defend." *Alticor, Inc. v. Nat'l Union Fire Ins. Co. of Pa.*, 345 Fed. Appx. 995, 999 (6th Cir. 2009).

The Sixth Circuit relied on the Seventh Circuit Court of Appeal's decision in *Taco Bell Corp. v. Continental Casualty Co.*, 388 F.3d 1069, 1075–76 (7th Cir. 2004) for its conclusion. The Seventh Circuit reasoned that if an insurer is "vigorously denying that it [has] any duty to defend," the insured has "an incentive to minimize its legal expenses (for it might not be able to shift them)." *Id*. The insured's "market incentive to economize" means "there is no occasion for a painstaking judicial review" of defense costs. *Id.* at 1076. Furthermore, an insurer could "have selected, supervised, and paid the lawyers" for the insured in the underlying lawsuit and later sought reimbursement but by declining to defend, the insurer is "gambling that it would be exonerated from a duty to defend." *Id.* Lastly, the court noted that "the duty to defend would be significantly undermined if an insurance company could, by the facile expedient of hiring an audit firm to pick apart a law firm's billing, obtain an evidentiary hearing on how much of the insured's defense costs it had to reimburse." *Id.* at 1077. These practical reasons undergird the reason for the rule.

Amway is entitled on this record to an award of actual defense costs incurred in defending the Internet Video Claim. The Record Companies' counter-claim triggered AISLIC's duty to defend, but AISLIC wrongfully declined to do so. AISLIC must reimburse Amway's actual defense costs, which are a reasonable measure of recoverable costs under applicable law.

Moreover, there is no triable issue here on the reasonableness of the costs. AISLIC contends that the defense costs are unreasonable because: (1) the hourly rates charged by Amway's out-of-state counselors are excessive; and (2) block billing and vague billing entries should be discounted. Though AISLIC "anticipates presenting evidence and expert testimony" on the issue, the evidence currently proffered does not create a triable issue, even if waiver did not apply.

AISLIC does not challenge the reasonableness of the settlement itself but argues that it is only obligated to reimburse a portion of the settlement attributable to Amway's own actions. AISLIC contends that based on the terms of its Policy, it is only required to provide coverage for claims "made against you for your wrongful act(s)," and the terms "you" and "your" do not include Amway's IBOs and BSM suppliers. This argument fails under the plain language of the Policy. The Policy's broad definition of "your" acts includes actions taken by "any agent or independent contractor, including distributors, licensees and sub-licensees, in their provision of material for Internet media on behalf or at the direction of" Amway. The videos were posted onto the Internet by the IBOs and BSM suppliers at the direction of Amway as part of its "Growth Through Innovation" marketing strategy. The IBOs and BSM suppliers certainly could satisfy the definition of "your" in the eyes of any reasonable factfinder.

In sum, AISLIC is liable for Amway's actual defense and indemnity costs since the date of the counter-claim, a total of $24,076,382.41.

### CONCLUSION

Based on the parties' input, the Court originally bifurcated this case into two phases. The first phase addressed a series of coverage issues under the First Case Management Order (ECF No. 21) and culminated in a series of dispositive motions (ECF Nos. 64, 66, 70 and 71). The second phase addressed damages and related issues under the Second Case Management Order (ECF No.

120) and resulted in another series of dispositive motions (ECF Nos. 229, 230, 232, 234). Based on this Opinion, the Court has resolved the issues that it believes can be decided now as a matter of law. In particular, the Court has concluded:

      1.    Only the July 2006 to July 2007 AISLIC policy is triggered because all claims of the Internet Video Claim(s) telescope to the first occurrence under its policy;

      2.    ACE fronting Policies do not constitute "Other Insurance" within the meaning of the AISLIC Policy;

      3.    AISLIC did not waive its right to rely on the plain language of its insuring agreement limiting its defense obligation to "suits";

      4.    AISLIC waived its right to challenge the reasonableness of Amway's actual defense costs, and there is no triable issue of reasonableness anyway on the present record;

      5.    Amway is entitled to reimbursement from AISLIC for the total settlement and defense costs since the date of the counter-claim, which totals to $24,076,382.41.

Amway also seeks penalty interest under MCL 500.2006. At this time, the Court does not resolve whether Amway is entitled to the penalty interest. There may also be other issues that the parties believe need to be addressed before judgment can be entered. To focus these issues, the parties shall file not later than February 28, 2022, a Joint Statement summarizing any issues, in addition to statutory penalty interest, they believe still need resolution.  The Court will then set a briefing schedule based on its review of the Joint Statement.

**IT IS SO ORDERED.**

Dated:   __February 7, 2022__       __/s/ Robert J. Jonker_____
                                  ROBERT J. JONKER
                                  CHIEF UNITED STATES DISTRICT JUDGE